## Fletcher v. Wireman.
## Skidmore v. Fletcher.

(Decided March 4, 1913.)

### Appeals from Breathitt Circuit Court.

1. Specific Performance—Plaintiff May Have Judgment for What He Is Entitled to, Although He Asks More.—If the plaintiff in a suit for specific performance is defeated in part he may nevertheless have what he shows himself entitled to. He has the right to sue for the enforcement of the contract as he understands it, and is entitled to recover the whole or such part of the thing in controversy as the facts show him entitled to.

2. Specific Performance—Delay in Setting Up Fraud as Defense— Effect of.—A party who claims to have been defrauded in the execution of a contract must assert this defense within a reasonable time after a suit has been brought against him to enforce the contract, or within a reasonable time after he has discovered the fraud, or else he will be deemed to have waived his right to rely on the alleged fraud in the execution of the contract.

3. Lis Pendens Notice—Failure of Clerk to Index or Do His Duty Does Not Prejudice Right of Party Filing.—When a lis pendens notice is sufficient in form and is filed in the proper office, the party filing it will be protected, although the clerk may fail to discharge his duty in connection with it. The statute does not impose upon the party filing the notice the duty of seeing that it is properly indexed.

J. C. C. BACH, GRANNIS BACH and HAZELRIGG & HAZEL-RIGG, for Fletcher.

McQUOWN & BECKHAM and GOURLEY & REDWINE for Wireman.

PENDLETON, BUSH & BUSH and C. F. SPENCER for Skidmore.

Opinion of the Court by Judge Carroll—Reversing Judgment on Each Appeal.

These two appeals coming upon the same record, and involving substantially the same questions, will be disposed of in one opinion.

The original suit was brought by Fletcher against Wireman to enforce the specific performance of a contract concerning real estate which Fletcher alleged he had purchased by executory contract from Wireman. Pending this suit Skidmore, to whom Wireman conveyed the land that Fletcher claimed had been sold to him, filed an intervening petition asserting his rights, and upon final hearing the court dismissed the petition of Fletcher as well as the petition of Skidmore, and from this judgment both Fletcher and Skidmore appeal.

To understand the questions raised on these appeals it will be necessary to make a somewhat extended notice of the pleadings. In Fletcher's suit against Wireman, which was brought March 15, 1905, he averred that on March 7, 1905, in consideration of $2,000, $100 of which was paid in cash, Wireman contracted to sell and convey to him, upon the payment of the other $1,900, a tract of land containing 1,200 acres more or less, and also to assign to him claims against Taulbee and Neeley.

He also averred that there were two suits pending in the United States Circuit Court in which Paul Schuster was plaintiff and Wireman and Taulbee were defendants; in which suits Schuster sought to enjoin Wireman and Taulbee from cutting and removing timber from the land that Wireman claimed to own and which he had contracted to sell to him, and to recover the land. That these actions were being prosecuted for his benefit, as by an arrangement with Schuster he had become the owner of Schuster's interest in the land.

He further averred that in February, 1905, he and Taulbee entered into an agreement by which Taulbee was to pay him $2,500 for the timber that Taulbee had cut and removed from the land, and he was to protect

Taulbee against any claim Wireman asserted against him. That when this arrangement was made between himself and Taulbee, negotiations were pending with Wireman for the purchase of the land claimed to be owned by Wireman, but which was also claimed by Schuster, and from which the timber had been cut by Taulbee.

He further averred that at the time this contract, which was in writing, was executed, it was agreed between himself and Wireman, as a part of the contract to sell and purchase, that Wireman should assign and transfer to him all claims he had against Taulbee for timber that he had sold to Taulbee from the land, and which was the same timber sought to be recovered by Schuster for the benefit of Fletcher in the actions before mentioned in the United States Court, but that by a mistake of the draughtsman of the contract this condition was omitted. He prayed for a specific performance of the written contract and also that Wireman be required to assign to him his claim against Taulbee for timber cut from the land.

In June, 1905, Wireman filed an answer and counterclaim in which he averred that he was not a party to or concerned in the settlement made between Fletcher and Taulbee, and while admitting the written contract for the sale to Fletcher of the land, and the assignment of the Neely claim, denied that he agreed to assign or transfer to Fletcher his claim against Taulbee. He averred that the writing contained the only contract between them, and that nothing was omitted from it by mistake or oversight. He further expressed his willingness to comply with the written contract and tendered to Fletcher a deed conveying to him, in consideration of $2,000, the land described in the contract, as well as the Neely claim, and sought judgment against Fletcher on his counterclaim for the balance of $1,900 due on the contract.

To this answer a reply was filed controverting certain affirmative statements and asking the relief sought in the petition. After this, and in 1905, the depositions of Fletcher, Bach, Taulbee and others were taken by Fletcher, but no other pleadings were filed or orders made in the case from 1905 until March, 1908, when Wireman filed an amended answer and counterclaim. He also filed in March, 1909, another amended answer and counterclaim, and in these pleadings he averred in substance that neither Fletcher nor Schuster, nor any one

else, had any interest in or title to the land in controversy except himself; that the land at the time the writing was executed was worth more than $2,000, and that Taulbee, who was solvent and responsible, owed him at that time for timber, $2,500.

He further averred that it would be unjust to compel him to convey to Fletcher for the consideration of $2,000 land worth over $2,000 and the claim of Taulbee of $2,500, and tendered back to Fletcher the $100 paid him when the writing was executed. He further averred that at the time, and before he contracted to sell the land, Fletcher, and other persons acting for him, knowing that he was an ignorant and unlearned man, without education or experience, or knowledge of litigation, represented to him that Schuster would be successful in his suits, for a recovery of the land, pending in the United States courts, and that alarmed by the false representations of Fletcher and others acting in his interest as well as by certain intimidating acts committed by Fletcher, he was overreached and defrauded into executing the contract agreeing to sell the land to Fletcher. In these pleadings he withdrew his offer of performance and asked a rescission of the contract.

In December, 1909, Skidmore tendered his intervening petition, in which he set up that in January, 1907, he purchased from Wireman the tract of land described in the contract and petition, and paid him therefor $5,300; whereupon Wireman executed to him a deed, which he accepted and put to record in the proper office. He further averred that he was a purchaser for a valuable consideration, without notice of the pendency of the action of Fletcher, or of his claim to the land, and that he did not have any notice of the action brought by Fletcher against Wireman until October, 1908. He further averred that before purchasing the land he caused the title to the same to be examined by a competent attorney, who pronounced it good, and that no *lis pendens* notice of the pendency of Fletcher's action had been recorded, as required by law. He asked that he be made a party to the action, and as he was the real party in interest, that he be permitted to defend the suit of Fletcher against Wireman.

For answer to Skidmore's petition Fletcher, after denying the affirmative averments thereof, set up affirmatively that Wireman had no paper or possessory title to a large part of the land that he had contracted to sell

him, and that Skidmore, before he purchased, had constructive notice of the pendency of Fletcher's action by virtue of a lis pendens notice which was filed in the proper office when the action was filed.

In March, 1910, Fletcher dismissed without prejudice so much of his petition as sought a reformation of the written contract, the effect of this being that he only sought an enforcement of the written contract.

A good deal is said in argument of counsel about the condition of the title to the land, and it is earnestly contended, on the one side, that Wireman had no title except to a small part of the land, while, on the other, it is said he had a paper or possessory title to the whole of it. But we do not think it material in disposing of this case to make any extended notice of the condition of the title to this land. It is sufficient to say that Wireman had a paper title to a small part of the land and claimed the remainder of it by adverse possession, while Schuster asserted title to the whole of it. It is likely that Wireman believed he had a paper and possessory title to the whole of it, and it is probable that Fletcher believed that Wireman could only hold so much of it as he had paper title to, and that Schuster's claim to the remainder of it was better than Wireman's. At any rate Fletcher, in view of the fact that he had obtained whatever title Schuster might have, was willing to purchase Wireman's title, whatever it might be.

It is also manifest that, except for the insistence on the part of Fletcher that he should have assigned to him the claim of Wireman against Taulbee, there would have been no litigation between Fletcher and Wireman, because Wireman, until 1908, was willing to convey to Fletcher all his right, title and interest in the land, excluding the Taulbee claim, and after Fletcher had dismissed so much of his petition as sought to compel an assignment to him by Wireman of the Taulbee claim, the only issue between the parties was that made by the amended answer of Wireman seeking a rescission on the ground of fraud.

Both parties changed attitudes. Fletcher was willing to stand by the written contract that he at first said did not embrace the entire contract, and Wireman abandoned the written contract, which he expressed himself willing to perform, and sought to defeat the entire contract upon the ground of fraud.

Putting aside for the moment the question of fraud, it. is insisted by counsel for Wireman and Skidmore that, as Wireman tendered a compliance with the contract as written, which Fletcher, by his subsequent conduct in withdrawing his demand for the Taulbee claim, admitted was a full performance of the contract, Fletcher should not be heard to say, after refusing for three years to accept the full performance of the contract tendered by Wireman, that he was nevertheless entitled to then accept the performance tendered and compel Wireman to make performance.

We do not find ourselves able to agree with counsel in this contention. The fact that Fletcher demanded more than he was entitled to did not deny him the right to have judgment for what he was entitled to, and besides Wireman is not in a position to complain of the delay, as he had it in his power at any time to bring the matter to an issue and have the court determine the rights of the case.

If the plaintiff in a suit for specific performance is defeated in part he may nevertheless have what he shows himself entitled to. If the case had been submitted on the pleadings in 1905, judgment would have gone in favor of Fletcher according to the terms of the written contract, as Wireman admitted this contract was made, and the delay in preparing the case for trial and the refusal of Fletcher to accept the tender made by Wireman did not change the status of the case or put Fletcher in any worse position or Wireman in any better position than they would have been if the case had been brought to trial before the amended answer of Wireman was filed.

To adopt the rule that the plaintiff in a suit for specific performance must not ask any more than his adversary is willing to concede, unless he can maintain his claim on final hearing, might in many cases put the plaintiff at a very great disadvantage by leaving him without relief merely because he honestly sought to enforce the contract as he understood it. The plaintiff in suits like this, as well as in other suits concerning contracts, has the right to sue for the enforcement of the contract as he understands it, and is entitled to recover the whole or such part of the thing in controversy as the facts show him entitled to.

Taking up next the question, whether or not the contract should be rescinded for fraud, we find from the evidence substantially the following state of facts: Some-

time previous to March, 1905, Wireman had sold the timber on the land in controversy to Taulbee, a solvent, responsible man, for $2,500, and Taulbee had cut and removed some of the timber from the land. After this, but before March, 1905, two suits had been brought in the United States Court in the name of Schuster against Wireman and Taulbee to recover the value of the timber cut and carried away by Taulbee, and to enjoin him from removing any more of it. These suits, although in the name of Schuster as plaintiff, were really prosecuted for the benefit of Fletcher and proceeded on the theory that the land from which the timber was cut was owned by Schuster.

Previous to the date of the contract made between Wireman and Fletcher, negotations had been pending between Taulbee and Fletcher for a settlement of these suits. And these negotiations had reached a point where Taulbee agreed to pay Fletcher for the timber if Fletcher would protect him against Wireman, from whom he had bought it, and this Fletcher agreed to do, provided he could purchase the land from Wireman.

Taulbee testifies that he was anxious to have the matter settled, and that Wireman told him that he had been made an offer by Fletcher of some seventeen or eighteen hundred dollars, and that if Fletcher would increase his offer he would sell him the land, and also his claim against him. In a short while after this the contract between Fletcher and Wireman was entered into and the suits pending against Taulbee were dismissed.

It also appears that Taulbee, before 1908, paid to Fletcher the $2,500 that he had agreed to pay Wireman for the timber, this payment being made under an agreement by which Fletcher was to protect Taulbee from Wireman.

In 1905 Fletcher gave his own deposition and also took the depositions of Taulbee, Bach, Whittaker and others, and at the taking of these depositions Wireman was represented by counsel. In these depositions Fletcher, Bach, Whittaker and Taulbee testify very fully concerning all the circumstances and facts leading up to and surrounding the execution of the contract between Wireman and Fletcher, and if the evidence of these witnesses is to be believed there can be no doubt that Wireman agreed, as a part of the contract, to assign to Fletcher his claim against Taulbee.

Mr. Bach, the attorney for Fletcher, who dictated to a
stenographer the contract between Wireman and
Fletcher after it had been fully agreed on, says that by
oversight or mistake on his part there was omitted from
it any reference to the Taulbee claim. These witnesses
testify that there was no fraud of any kind or character
practiced on Wireman, or any misrepresentation of any
sort made to him; that the trade was made with Wireman
in order to end the litigation about the title to the land
and to get the matter settled up.

Wireman did not give his deposition until 1909, after
he had concluded to ask a rescission of the contract. He
testifies in substance that he had been advised that there
was danger of losing the land in the suits of Schuster if
he did not sell it, and that being ignorant and illiterate,
he was alarmed and intimidated by the fear that his land
would be taken from him by Fletcher, who was a shrewd,
smart fellow, and representing a corporation that had
ample means to harass and annoy him with litigation. He
further says that a surveyor who had been sent by the
United States Court in the Schuster cases to survey the
land was accompanied by armed guards, and that a few
houses located on the land claimed by Fletcher were
burned by Fletcher, or at his instance, and that these
circumstances also put him in fear and induced him to
enter into a contract that he would not have made if he
had not been alarmed and intimidated and put in fear by
the threats and conduct of Fletcher and those acting in
concert with him. It also appears from his evidence that
he was not represented by counsel in the interviews lead-
ing up to the execution of the contract, or at the time it
was executed, and that the land, independent of the
Taulbee claim, was worth more than the price at which
he contracted to sell it to Fletcher.

After carefully reading the record it seems to us quite
evident that the claim of Wireman, that the contract with
Fletcher was obtained by fraud and intimidation, was an
afterthought on his part, having its entire origin in the
circumstances that he sold the land to Skidmore for more
than he agreed to sell it to Fletcher.

Wireman is probably an illiterate man, but we do not
think he is quite so ignorant or helpless as his counsel
would have us believe. He had shrewdness enough to
sell the land to Skidmore for over $5,000 at a time when
he had an answer pending in the Fletcher suit agreeing
that he had sold it to Fletcher for $2,000, in which answer

he asked that Fletcher be required to accept the deed tendered in his answer. But he carefully concealed all knowledge of the Fletcher suit from Skidmore.

It is passing strange, that if a fraud was practiced on him by Fletcher in 1905, that he did not discover this fraud until 1908, although in the meantime he was constantly represented by able counsel, and was placed by the evidence of Fletcher, Bach and others in full possession of all the facts and circumstances surrounding the transaction. It is manifest that he knew as much about the fraud when he filed his answer in 1905 as he did three years afterwards, and yet not a word do we hear from him about fraud until after he and others had defrauded Skidmore; nor does the record furnish any reason or execuse, except the one we have assigned, why Wireman did not sooner set up his defense of fraud and his demand for a rescission of the contract.

A party who claims to have been defrauded in the execution of a contract must assert this defense within a reasonable time after a suit has been brought against him to enforce the contract, or within a reasonable time after he has discovered the fraud, or else he will be deemed to have waived his right to rely on the alleged fraud in the execution of the contract.

In speaking to this point Mr. Pomeroy in his Equity Jurisprudence, vol. 2, sections 916-917, uses the following pertinent and applicable language:

"While the party entitled to relief may either avoid the transaction or confirm it, he cannot do both; if he adopts a part, he adopts all; he must reject it entirely if he desires to obtain relief. Any material act done by him, with knowledge of the facts constituting the fraud, or under such circumstances that knowledge must be imputed, which assumes that the transaction is valid, will be a ratification.

"The most important practical consequence of the two principles above mentioned is the requisite of promptness. The injured party must assert his remedial rights with diligence and without delay, upon becoming aware of the fraud. After he has obtained knowledge of the fraud, or has been informed of facts and circumstances from which such knowledge would be imputed to him, a delay in instituting judicial proceedings for relief, although for a less period than that prescribed by the statute of limitation, may be, and generally will be, regarded as an acquiescence, and this may be, and generally will

be, a bar to any equitable remedy. To this rule there is one limitation; it applies only when the fraud is known or ought to have been known. No lapse of time, no delay in bringing a suit, however long, will defeat the remedy, provided the injured party was, during all this interval, ignorant of the fraud. The duty to commence proceedings can arise only upon his discovery of the fraud; and the possible effect of his laches will begin to operate only from that time.''

And in vol, 2, section 964, the learned author says:

''Where a party originally had a right of defense or of action to defeat or set aside a transaction on the ground of actual or constructive fraud, he may lose such remedial right by a subsequent confirmation, by acquiescence, and even by mere delay or laches. * * * If the party originally possessing the remedial right has obtained full knowledge of all the material facts involved in the transaction, has become fully aware of its imperfection and of his own rights to impeach it, or ought, and might, with reasonable diligence, have become so aware, and all undue influence is wholly removed so that he can give a perfectly free consent, and he acts deliberately, and with the intention of ratifying the voidable transaction, then his confirmation is binding, and his remedial right, defensive or affirmative, is destroyed.''

And in vol. 2, section 965:

''When a party with full knowledge, or at least with sufficient notice or means of knowledge, of his rights, and of all the material facts, freely does what amounts to a recognition of the transaction as existing, or acts in a manner inconsistent with its repudiation, or lies by for a considerable time and knowingly permits the other party to deal with the subject-matter under the belief that the transaction has been recognized, or freely abstains for a considerable length of time from impeaching it, so that the other party is thereby reasonably induced to suppose that it is recognized, there is acquiescence, and the transaction, although originally impeachable, becomes unimpeachable in equity. Even where there has been no act nor language properly amounting to an acquiescence a mere delay, a mere suffering time to elapse unreasonably, may of itself be a reason why courts of equity refuse to exercise their jurisdiction in cases of actual and constructive fraud, as well as in other instances. It has always been a principle of equity to discourage stale demands; laches are often a defense wholly independent of the stat-

ute of limitation. Promptness in asserting a remedial right against fraud is sometimes required; but no delay will prejudice a defrauded party as long as he was ignorant of the fraud. Each case involving the defense of delay or lapse of time must, to a great extent, depend upon its own circumstances.''

We think the evidence is wholly insufficient to set aside the contract on the ground of fraud and the court should have enforced performance of the written contract.

The remaining question relates to the status of Skidmore. Skidmore claims that when he bought the land from Wireman he had no notice of the pendency of the suit of Fletcher for specific performance, and the evidence fully supports him in this position. It appears that he employed attorneys to investigate the title to the land, and these attorneys reported that Wireman had a good title. It is also shown that he was advised by one of the attorneys representing Wireman in the suit with Fletcher and to whom he paid the purchase price that the title of Wireman was good. This attorney, as he testifies without contradiction, did not give him any information of the pendency of the suit of Fletcher, although of course he knew it was pending and knew that the only answer Wireman had in the case was the one in which he expressed a willingness to comply with the contract with Fletcher. But the fact that he purchased without actual notice of Fletcher's suit, or the fact that a fraud was practiced on him by Wireman, or the fact that the attorney did not put him in possession of the facts within his knowledge, or the fact that his employed counsel was not diligent does not help his case if Fletcher, before Skidmore purchased, had given the lis pendens notice required by statute.

That such a notice was duly and properly filed by Fletcher long before Skidmore purchased the land is not disputed by counsel for Skidmore, but it is insisted that because this lis pendens notice was not properly indexed Skidmore was not required to take constructive notice of its existence. The evidence shows that when the notice in due form was filed by Fletcher it was indexed under the letter ''E'' when it should have been indexed under the letters ''F'' and ''W,'' but Fletcher is not to be prejudiced by the failure of the clerk to properly index the notice.

When a lis pendens notice is sufficient in form, and is filed in the proper office, the party filing it will be protected, although the clerk may fail to discharge his duty in connection with it. The statute does not impose upon the party filing the notice the duty of seeing that it is properly indexed. This question came before the Michigan court in Heim v. Ellis, 49 Mich., 241, and in the course of the opinion the court said:

"It is shown in this case that in the suit to correct the Wilkinson deed a notice of lis pendens was duly filed. This notice had been lost from the files and was not entered on the file book as it should have been, but that was not the fault of the party. The filing of the notice was a warning to the whole world that any title Perry claimed was liable to be divested by that suit; and whoever became the purchaser of the mortgage afterwards would take it with constructive notice. If in point of fact he never saw or heard of the *lis pendens,* that was his misfortune; but one who relies upon the recording laws to take from the real owner an actual title must always understand that his case is *strictissmmi juris,* and that unless he brings it within the statute in every particular he is entitled to no protection. The notice implied from a statutory record is not defeated by a careless loss or accidental destruction. If the statute is once complied with the effect as notice continues, notwithstanding the record may fail, from accidental or other reasons, to give the designed information."

In the analogous case of Herndon v. Ott, 119 Ky., 814, a purchaser of land was misled to his prejudice as to the condition of the title by the oversight of the clerk in failing to index the deed. In holding that the party producing the deed for record could not be prejudiced by the negligence or oversight of the clerk, we said:

"When a grantee presents a deed acknowledged according to law, and lodges it for record, and has it recorded, he has done all that the law requires him to do to give notice for the protection of others. We are of the opinion that after the grantee has done all that the law requires he should not be held accountable and be made to suffer for the mistake, carelessness or fraud of the clerk."

In the condition of the record the only relief Skidmore can have is to be substituted to the rights of Wireman in his contract with Fletcher. He is entitled to be paid by Fletcher all of the money that under the written contract

Fletcher now owes Wireman for the land, and of course he may also sue Wireman and recover from him the balance of the purchase money paid by him for the land.

The judgment on each appeal is reversed with directions to proceed in each case as indicated in this opinion.