# Natural Rock Asphalt Corporation v. Carter, et al.

(Decided June 24, 1927.)

(Rehearing Denied, with Modification, October 7, 1927.)

## Appeal from Edmonson Circuit Court.

1. Appeal and Error.—Where no judgment was entered in favor of one of defendants in lower court, it was not a proper party on appeal after judgment in favor of its codefendant.

2. Contracts.—Where person contracting to quarry and crush asphalt rock continued to work after learning or opportunity to learn all facts by reasonable diligence, he cannot thereafter say that he was induced to enter into contract by reason of alleged false and fraudulent statements, and have contract rescinded on such grounds.

3. Contracts.—Where person contracting to quarry and crush asphalt continued to work on contract for more than three months with no complaint as to misrepresentations, and at time of abandonment gave as reason therefor certain alleged breaches in failure to pay for material that would have been produced in absence of delay caused by such breaches, he will be held to have not asserted his rights within reasonable time after obtaining knowledge of fraud or learning facts from which such knowledge would be imputed.

4. Contracts.—Where person contracting to quarry and crush asphalt was delayed to considerable extent by breaking of crusher furnished by owner and other matters due to fault of owner and for which he was not responsible, he is entitled under his contract to any loss sustained by reason of such delay.

5. Contracts.—Remedy of person contracting to quarry and crush asphalt for damages sustained by reason of delays occasioned by owner was on bond furnished by owner, and not rescission of contract.

6. Damages.—Where person contracting to quarry and crush asphalt abandoned contract without authority, owner is entitled to recover reasonable cost of restoring quarry to original condition on proof showing it was not operated in a workmanlike manner.

7. Damages.—Where person contracting to quarry and crush asphalt abandoned contract without authority, owner's measure of damages for failure to produce material is difference between price which was to be paid and what it would have reasonably cost to have same work done, or what it actually did cost owner to do work, provided plant was operated in reasonably prudent manner.

8. Damages.—Where person contracting to quarry asphalt had no knowledge of owner's later contract to furnish stone to another, damages cannot be recovered on breach of quarrying contract be-

cause of owner's inability to complete such subsequent collateral contract.

THOMAS, THOMAS & LOGAN, WILLIS & TAYLOR and B. M. VINCENT for appellant.

LOGAN & McCOMBS, PERCY N. BOOTH and BOOTH & CONNER for appellees.

OPINION OF THE COURT BY JUDGE REES—Reversing.

This is an appeal from a judgment of the Edmonson circuit court in a suit by the Natural Rock Asphalt Corporation to recover $200,000 against W. W. Carter for damages for breach of contract and $50,000 against the National Surety Company, surety on Carter's contract.

The appellant, Natural Rock Asphalt Corporation, was organized in 1920 for the purpose of producing and selling rock asphalt for road building purposes. The Natural Rock Asphalt Corporation, hereinafter referred to as the company, purchased 100 acres of land, and leased 350 acres which contained a deposit of asphalt. The land was located in Edmonson county on Bear creek a short distance from its junction with Green river. The company installed a plant and equipment for the purpose of quarrying and crushing the material, and began to operate the plant during the latter part of the year 1922. After producing about 3,000 tons of material, the company conceived the plan of letting by contract certain portions of the work incident to producing, transporting, and selling the material.

Rock asphalt in its natural state is a sandstone impregnated with bitumen, or asphalt substance, and is found in deposits of varying thickness covered by varying quantities of earth and rock. It must be quarried, run through a primary crusher, and then pulverized before it is ready for use. The first step in quarrying consists in stripping the overburden consisting of earth, unimpregnated sandstone and lean rock, which is sandstone impregnated with bitumen, but with not sufficient quantity thereof to render the rock merchantable. The merchantable rock is then shot down with dynamite and run through a primary crusher.

The company had installed equipment on its property on Bear creek to perform these steps of the process of preparing the rock asphalt for market. The crushed rock was then loaded on barges on Bear creek, trans-

ported thence to Green river, and down Green river a distance of 80 miles to Rockport, a railroad shipping point. At Rockport the company had installed a pulverizing plant, and, after the rock was pulverized, it was loaded on cars for shipment to purchasers. The company decided to contract the quarrying and crushing of the material at its plant on Bear creek, the transportation of the material down Bear creek and Green river to Rockport, and to have the finished material sold on commission. Thus the only step to be carried out by the company should these contracts be made would be to run the material through its finishing mill at Rockport and load it on cars.

About February 1, 1923, John B. Lessenberry, appellant's sales manager, saw the appellee, W. W. Carter, and informed him that the company proposed to contract the quarrying and crushing of the material, and arranged for Carter to meet Phil W. Grinstead, president of the company, and go to the quarry in Edmonson county. Grinstead, Carter, and two other men, who contemplated bidding on the contract, went to the company's plant on Bear creek in Edmonson county, and examined the quarry and equipment then on hand and in use.

On February 19, 1923, the company and Carter entered into a contract whereby Carter agreed to quarry, crush, and load on barges at the landing at the plant on Bear creek a minimum of 50,000 tons of natural rock asphalt between March 1 and December 31, 1923, in accordance with a certain schedule of monthly tonnage at a price of $1.45 per ton. The company agreed to furnish its plant and equipment then located at its quarry in Edmonson county and the barges necessary to receive the asphalt. Carter agreed to provide an extra steam shovel and an extra locomotive, the latter to be used in hauling the rock from the quarry to the crusher a distance of about 4,000 feet. In order to insure the faithful performance of the contract by each of the parties, the company executed and delivered to Carter a bond in the sum of $10,000, and Carter executed and delivered to the company a bond in the sum of $50,000. The National Surety Company signed each of the bonds as surety. After making the contract with Carter to quarry the material, run it through the primary crusher, and deliver it on barges, the company made a contract with F. J. Traut to transport the material from the plant on Bear creek to

the plant at Rockport. Traut was to receive 75 cents a ton for a minimum of 50,000 tons. The company then made a contract with certain representatives to sell the material. The only step to be carried out by it was to run the material through its finishing mill at Rockport and load it on cars.

On June 9, 1923, Carter ceased operations under the contract, and notified the company that he had abandoned it. At that time he had quarried, crushed, and delivered on barges 3,554 tons, whereas the contract provided that he should produce and deliver 1,000 tons in March; 3,000 tons in April; 6,000 tons in May; and 7,000 tons in June. The company then instituted this action against Carter and the National Surety Company, as surety on his bond, for damages for breach of the contract.

It was alleged in the petition that Carter had failed to quarry, crush, and load on barges the tonnage of rock asphalt which the contract called for; that the contract called for a minimum of 50,000 tons, and the maximum mentioned in the contract had been demanded by the appellant for one month prior to the time that Carter abandoned the contract, which brought the total tonnage which Carter was compelled to furnish up to 52,000 tons; that of this he had produced and delivered only 3,554 tons, leaving a shortage of 48,446 tons; and that the company was entitled to recover from Carter the full net profit which it would have realized on the tonnage which he failed to produce and from the National Surety Company on the same grounds up to $50,000. It was further alleged that Carter failed to develop or operate the quarry so as to keep it in good, workable condition, or to preserve and protect the property of the company, and that his failure to develop and operate the quarry in a workmanlike manner and to keep the equipment in proper repair, and to skillfully and properly dispose of the strippings or overburden, resulted in large damage to the company. Other items of damage were alleged, such as the cost of transportation by reason of the contract with Traut and certain fixed overhead charges.

In his answer Carter interposed a plea that he was induced to enter into the contract on account of certain fraudulent representations of the company and its officers and agents. As further grounds which justified him in rescinding the contract, Carter alleged in his answer that the company was insolvent and unable financially to carry

out its contract, and that certain acts on the part of the company had rendered it impossible for him to carry out his part of the contract. In a counterclaim he sought to recover $37,500 as profits which he alleged he could have made on the contract if everything had been as represented, and $25,000 which he lost in preparing to carry out the contract and the amount he was entitled to for producing 3,500 tons of asphalt while he was engaged in the work.

The company filed a reply traversing all of the affirmative allegations in the answer, and by agreement the action was transferred to the equity side of the docket.

A large amount of testimony was taken, and upon a submission of the case the chancellor entered a judgment in favor of Carter for the sum of $5,075, and dismissed plaintiff's petition. The National Surety Company had filed an answer interposing certain defenses, but no judgment was entered by the lower court in its favor, and the case was retained on the docket as to the issues arising on the pleadings between the Natural Rock Asphalt Corporation and the National Surety Company. The surety company was made a party to this appeal, and it has filed a motion to dismiss the appeal as to it. As no judgment was entered in its favor in the lower court, it is not a proper party on this appeal, and its motion to dismiss the appeal as to it is sustained.

Carter's grounds for rescinding the contract, as set up in his answer, are on account of the false representations in obtaining it, these alleged false representations being, in substance, that John B. Lessenberry represented to him that the company had a large crusher that would crush from 2,000 to 2,500 tons of material daily; that the material was as easily crushed as limestone; and that it was a steam shovel proposition, i. e., that the material, after it was shot down on the floor of the quarry, could be handled with a steam shovel; that Phil W. Grinstead, president of the company, represented to him while he was at the quarry that it was difficult to get enough lean material to bring the bitumen content down to the requirements; that it was represented to him that Bear creek was a navigable stream; and that the company had sufficient barges to receive the material as he produced it; that it also represented to him that some one else had offered to produce the material for less than the amount specified in his contract, and that the removal of only

10,000 tons of overburden would be required to obtain 50,000 tons of merchantable asphalt. He alleged in his answer that all of these representations were falsely and fraudulently made to him by the representatives of the company and that but for such false and fraudulent statements and misrepresentations he would not have signed the contract, but that he was compelled to, and did, rely upon these statements, and by reason thereof was induced to enter into the contract.

A great mass of testimony was taken bearing on the question as to whether or not the alleged statements were made, and, if so, whether they were true or false. Lessenberry denied that he told Carter that the crusher owned by the company would produce from 2,000 to 2,500 tons of material daily, or that the material was as easily crushed as limestone. He admits that he might have told him that the quarry was operated in the same manner as a limestone rock quarry. It is shown that as much as 500 or 600 tons of material was actually crushed in one day, and this was far more than the maximum amount required per day under the contract. The representation, therefore, that the crusher would produce from 2,000 to 2,500 tons of material daily, if made, was not material. Furthermore, when Carter visited the quarry before entering into the contract, he inspected the crusher and, being familiar with that kind of machinery, he could have easily determined its capacity for himself. At the time he visited the quarry a large quantity of rock had been shot down on the floor of the quarry, and he could have determined for himself the character of this rock, and whether or not it could be handled with a steam shovel. The evidence discloses that, while some of it must be handpicked, a large portion of it can be handled with a steam shovel. He could also see Bear creek and determine for himself whether or not it was navigable. The proof discloses that Green river has been rendered navigable by the construction of locks and dams, and that one of these dams backs the water up Bear creek to the point where the quarry is located, and that it is thus rendered navigable during all seasons. The representations he claims were made in regard to the number of barges owned by the company were substantially true, and it does not appear that other barges could not have been obtained within a reasonable time if the ones on hand had

proved insufficient. The representations that he claims were made to him in regard to the amount of overburden and the price that another bidder had made on the contract present some difficulties.

After Carter had been to the quarry and looked over the property, he submitted a bid whereby he was to be paid 30 cents per cubic yard for removing earth overburden; $1 per cubic yard for removing unmerchantable rock; and $1.25 per ton for quarrying and crushing the merchantable rock. The company desired to know exactly what the merchantable rock was going to cost it, and Grinstead, the president of the company, undertook to show Carter that his bid was equivalent to $1.45 per ton for merchantable rock. Carter claims that Grinstead represented to him that another bidder had offered to do the work for $1.05 per ton for merchantable rock. This bidder had not agreed to do the work at a flat rate for the merchantable rock produced but he had agreed to remove the overburden for 72 cents per cubic yard, and to quarry and crush the asphalt rock for 80 cents per ton. Grinstead arrived at the figures of $1.05 per ton for merchantable rock by estimating that the removal of approximately 25,000 cubic yards of overburden would expose 75,000 tons of merchantable asphalt. A great quantity of testimony was taken by the company to show that these figures were approximately correct, and an equal amount was taken by the appellee Carter tending to show that it would be necessary to remove a much greater quantity than 25,000 cubic yards of overburden to expose 75,000 tons of asphalt. The weight of the evidence tends to show that the amount of overburden was considerably underestimated by Grinstead in his talk with Carter before the contract was closed.

Waiving the question whether the statements made to Carter concerning the amount of overburden required to be removed and the price at which another bidder had offered to do the work were false, and whether the proportion of the overburden to the merchantable rock was apparent upon the investigation which Carter made before he entered into the contract, we are of the opinion that, having continued to work after he learned of all the facts, or could have learned them by reasonable diligence, he cannot now say he was induced to enter into the contract by reason of these alleged false and fraudulent

statements and have the contract rescinded. In Fletcher v. Wireman, 152 Ky. 565, 153 S. W. 982, this court said:

"A party who claims to have been defrauded in the execution of a contract must assert this defense within a reasonable time after a suit has been brought against him to enforce the contract, or within a reasonable time after he has discovered the fraud, or else he will be deemed to have waived his right to rely on the alleged fraud in the execution of the contract."

In Central Life Insurance Co. v. Taylor, 164 Ky. 844, 176 S. W. 373, the court said:

"Where one sues in equity to obtain the rescission of a contract, basing his claim to the relief sought upon the ground of fraud inducing the execution of the contract, he must act promptly in making his election of remedies, for if he fails to act promptly upon the discovery of the fraud, he loses his right to rescission in equity, and his only remedy then is an action for damages for the deceit."

Carter began work on March 1, 1923, and continued to work until June 9, 1923. During this time he made no complaint to any one that any facts had been misrepresented to him, nor did he assign that as his reason for abandoning the contract when he quit. He then gave as his reason for abandoning the contract certain alleged breaches on the part of the company and the failure on its part to pay him for material that he would have produced had he not been delayed on account of these breaches. When he ceased work, more than a third of the time covered by the contract had elapsed, and he quit during the season of greatest demand for the material which he was to produce. Under these circumstances he did not assert his rights within a reasonable time after he had obtained knowledge of the fraud, or had learned facts from which such knowledge would be imputed to him, conceding that such fraud in fact existed. Fletcher v. Wireman, supra; Reid v. Wilder, 204 Ky. 395, 264 S. W. 849; Cornett v. Kentucky River Coal Co., 175 Ky. 718, 195 S. W. 149.

It is also insisted that the appellee, Carter, was justified in abandoning the contract on account of certain acts of the appellant company, these being that a few days

before he was to begin work on March 1, 1923, the appellant, which was operating the plant at the quarry, broke the crusher, and he was delayed several days before it could be repaired; that appellant, which was to transport the extra steam shovel to be furnished by him by boat from Rockport to the plant on Bear creek, allowed the barge upon which it was being carried to sink, and thereby interfered with his work for 16 days; that soon after he took charge a judgment was obtained against appellant, and the equipment which had been turned over to him was levied on under an execution, and was held by the sheriff for six days, during which time he was not permitted to operate the plant; and finally that the appellant was insolvent and unable to meet its financial obligations.

The proof is clear that appellee was delayed to a considerable extent by the breaking of the crusher, the sinking of the steam shovel, and the levy of the execution on the equipment, for none of which he was responsible, and he is entitled under the contract to any loss that he sustained by reason of these things. While the appellant was in financial difficulties, a number of men who are financially responsible, so far as the record discloses, had guaranteed to procure any funds necessary to finance the company's part of the work during the year, and a short time after Carter abandoned the contract the company sold a large number of bonds, the proceeds from which took care of all outstanding indebtedness. While a dispute had arisen between the company and Carter as to the damages sustained by him by reason of the delays attributable to defaults of the company, the exact amount of such damages had not been agreed upon, although representatives of the company admitted that it was liable to Carter in some amount. Under the contract Carter was to be paid on the 15th of each month for the material quarried, crushed, and delivered by him during the preceding month. He had agreed that the company should be credited with the value of certain work that had been done by it before he took charge, and which amounted to more than $2,000, and, as he had produced only 3,500 tons of material when he stopped work on June 9, the first money to which he was entitled for material produced would have been due him on June 15th. The company, therefore, was not in arrears for any money due under the contract. If they were unable to agree on

the damages that Carter had sustained by reason of any acts of the company, or if the company refused to pay such damages, then Carter's remedy was on the bond, and not a rescission of the contract. Henderson Bridge Co. v. O'Connor & McCulloch, 88 Ky. 303, 11. S. W. 18, 957, 11 Ky. Law Rep. 146; Haydon, et al. v. St. L. & S. F. R. Co., 117 Mo. App. 76, 93 S. W. 833; 6 R. C. L. 926.

Having concluded that Carter was not authorized under the circumstances to abandon the contract, the question as to the measure of damages growing out of the breach of the contract remains to be determined. There is proof tending to show that Carter did not operate the quarry in a workmanlike manner, and that, after he ceased work, the company was put to considerable expense in cleaning it up, and lost about three weeks of time before operations could be resumed. This being true, the company is entitled to the reasonable cost to it of restoring the quarry to the condition it was in when Carter took possession and to the profits on such material as would have been produced during the time the plant could not be operated by reason of the condition in which it was left by Carter. After Carter left, the company took over the operation of the plant, using the equipment that had been furnished by it to Carter, and also the extra steam shovel and locomotive that had been purchased by Carter. From July 1st to November 1st it quarried and crushed approximately 9,000 tons of material; the amount produced during the months of November and December not being shown. The measure of damages for the breach of the contract, so far as failure to produce the material is concerned, is the difference between the price that Carter was to receive for quarrying and crushing the material and delivering it on barges and what it would reasonably have cost the company to have the same work done after Carter abandoned the contract, or what it actually cost the company to do the work, provided that it operated the plant in a reasonably prudent manner. The amount of material upon which such difference, if any, in the cost of production should be calculated, should be the amount the company was ready and able to receive. It may be assumed, in the absence of proof to the contrary, that, after it took charge of the plant, the company produced all of the material that it was able to receive and handle. Some claim is made that, while Carter was

still operating the plant, certain sales of material were lost on account of his failure to produce the amount called for by the contract and the consequent inability of the company to deliver it to possible purchasers. As has been observed, however, Carter's failure, during the time he was operating the plant, to deliver the quantity called for under the contract was at least partly due to defaults on the part of the company for which he was not responsible.

On March 3, 1923, nearly two weeks after the date of the contract between the company and Carter, the company entered into a contract with F. J. Traut, in which it agreed to furnish a minimum of 50,000 tons of natural rock asphalt, to be transported by Traut from the Bear creek plant to the mill at Rockport at 75 cents per ton. It is contended by the company that, since it was unable to fulfill its contract with Traut by reason of Carter's breach of his contract, the damages for which it was liable to Traut for the breach of the contract with him are recoverable from Carter. It is neither alleged nor proved that Carter had any notice or knowledge of the Traut contract at the time he entered into the contract with the company, nor that the subsequent contract was within the contemplation of the parties at that time, nor are the damages claimed such as may reasonably be supposed to have been in the contemplation of the parties at the time they made the contract as the probable result of the breach of it. This being true, the damages resulting from the breach of the subsequent and collateral contract cannot be recovered. Pulaski Stave Co v. Miller's Creek Lumber Co., 138 Ky. 372, 128 S. W. 96; Towles v. Cincinnati Tobacco Warehouse Co., 146 Ky. 301, 142 S. W. 401; Stevens & Elkins v. Lewis, Wilson, Hicks Co., 168 Ky. 648, 182 S. W. 840; Asher v. Howard, 178 Ky. 398, 198 S. W. 1149.

The record is not in shape to enter a judgment, and on the return of the case the lower court will refer it to the master commissioner to hear additional proof and report on the following matters: The amount, if any, due Carter on account of any defaults of the company prior to June 9, 1923; the amount reasonably necessary to place the quarry in as workable condition as it was when Carter took charge; the profits on such material as would have been produced during the time the plant could not be operated by reason of the condition in which it was left

by Carter; the reasonable cost per ton to the appellant for quarrying and crushing merchantable rock, after Carter abandoned the contract; and the amount of material the appellant was ready and able to receive and handle during the period from June 9, 1923, to December 31, 1923. The case will then be ready for final judgment.

Judgment reversed for proceedings consistent herewith.

Judge Logan not sitting.