## Mackenzie v. Eschmann's Executors.

(Decided March 6, 1917.)

### Appeal from Jefferson Circuit Court (Chancery Branch, No. 2).

1. Bills and Notes—Joint Makers—Fraud—Waiver.—Where one of the two joint makers of a promissory note, as a ground of defense, relies on the fraud practiced on the other maker, he is likewise bound by the other maker's conduct in waiving the fraud.

2. Bills and Notes—Fraud—Actions—Waiver.—Where a party, with knowledge of the fact that a contract has been obtained by fraud, thereafter enjoys the fruits of the contract and repeatedly affirms the contract by other unequivocal acts, he thereby waives the fraud and cannot rely thereon as a defense.

3. Bills and Notes—Payment—Agency of Endorser—Evidence.—In an action on a promissory note, evidence examined and held insuf-

ficient to show that an endorser was the holder's agent for the purpose of receiving payment on the note.

CLARENCE C. SMITH, KEITH L. BULLITT and KING, BROWER & HURLBUT for appellant.

R. A. McDOWELL for appellees.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming on the cross-appeal and reversing on the original appeal.

On July 25, 1911, F. W. R. Eschmann and E. A. Eschmann executed and delivered to E. F. Dunstan their promissory note, whereby they agreed to pay to the order of E. F. Dunstan, on or before thirty days after the date thereof, the sum of $7,500.00, with interest at the rate of six per cent. per annum. The note was secured by 130 shares of the capital stock of A. Engelhard & Sons Company, a Louisville corporation. The note bears the endorsements of E. F. Dunstan and H. L. Patterson. Claiming that he purchased the note for value and before maturity, plaintiff, Louis B. Mackenzie, brought this suit against F. W. R. and E. A. Eschmann, E. F. Dunstan, H. L. Patterson and A. Engelhard & Sons Company, to recover judgment on the note and enforce his lien upon the collateral by which the note was secured. The case went to trial as to F. W. R. Eschmann alone. During the progress of the case F. W. R. Eschmann died, and the action was revived in the name of his executors. On final hearing the chancellor dismissed the petition. From this judgment plaintiff appeals and F. W. R. Eschmann's executors prosecute a cross-appeal.

The note was executed under the following circumstances: H. L. Patterson was a large holder of stock in, and the chief officer of, the American Educational Company, a corporation engaged in the business of publishing a magazine known as "The American Educational Review." F. W. R. Eschmann and his son, E. A. Eschmann, resided in New York, where the son had been employed in the advertising department of "Hampton's Magazine." Young Eschmann had a friend by the name of Dingwall, who had also been soliciting advertisements for magazines. The two were anxious to get into business on their own account. During the spring of 1911, they met Patterson, who had recently opened a branch

office in New York City.    After several conferences, they agreed to purchase a controlling interest in the American Educational Company.    As neither of the young men had any means, the elder Eschmann agreed to finance the arrangement for his son, and it is probable, though not certain, that the Eschmanns were also to assist Dingwall.    As each of the parties gives a different version of the contract, it is not exactly clear how much money the elder Eschmann was to furnish, but the chancellor found, and the attendant circumstances support the conclusion, that the Eschmanns were to pay $15,000.00 cash and $10,000.00 in one year for a majority of the stock.    Upon the payment of these sums the stock was to be delivered by Patterson.    As it was not convenient at the time for the elder Eschmann to meet the cash payment, the Eschmanns executed the note in question, with the understanding that it was to be discounted by Patterson.    Patterson claims that as he could not secure the money from the payee, E. F. Dunstan, he had Dunstan endorse the note and thereupon took it to Chicago and sold it to the plaintiff, Mackenzie.    At that time he was indebted to Mackenzie in the sum of $2,-150.00, and to a third party in the sum of $4,000.00. Both he and Mackenzie testified that the consideration for the transfer was the release of Patterson's indebtedness to Mackenzie, the procuring of a release of the third party's claim for $4,000.00, and the payment to Patterson of $1,350.00 in cash.    The transfer took place and the consideration was paid about August 10th, 1911, and, therefore, prior to the maturity of the note.    Patterson says that he has at all times been ready to turn over the stock upon the payment by the Eschmanns of the contract price.

In addition to denying the allegations of the petition and amended petition, the elder Eschmann defended on the ground that E. F. Dunstan was a fictitious payee and his endorsement on the note was forged by Patterson; that the note was materially altered after its delivery; that it was executed without consideration and was obtained by fraud.

Without stating the evidence with reference to the first defense and without expressing any opinion as to its legal effect if it had been sustained, we deem it sufficient to say that it is not supported by the proof.    We are also convinced, by a careful examination of all the

evidence bearing on the question, that the charge that the note was materially altered is not sustained.

On the issue of fraud, the evidence, in brief, is as follows: The younger Eschmann and Dingwall both say that Patterson represented to them that the magazine had a paid subscription list of from 32,000 to 35,000, and that Patterson subsequently admitted that the list did not exceed 7,000. E. A. Eschmann also says that Patterson stated that the magazine was in a flourishing condition. In the record there are letters from a former secretary and treasurer of the American Educational Company addressed to Patterson, in one of which the writer states that the corporation was about $50,000.00 in debt, and that there would be little left for the stockholders, unless they bought some scholarships or space at a discount and worked it out. These letters also show that the subscription list is very much less than that stated by Patterson. The statute provides that "every holder is deemed *prima facie* to be a holder in due course; but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as a holder in due course." Kentucky Statutes, section 3720b, subsection 59. Construing this section, it has been frequently held that where a maker shows that the execution of a note was induced by the fraud of the holder's transferror, the burden then shifts to the holder to show that he is a holder in due course. Muir v. Edelen, 156 Ky. 212, 160 S. W. 1048; Barnard v. Napier, 167 Ky. 824, 181 S. W. 624. Here Mackenzie failed to testify that when he purchased the note he had no knowledge of the fraudulent representations alleged to have been made by Patterson. From the above evidence the chancellor concluded that the note in question was obtained by fraud, and as plaintiff did not rebut the *prima facie* case made out by defendant he further held that plaintiff did not sustain the burden of showing that he was a holder in due course.

Whether the chancellor's finding of fraud is correct or not we deem it unnecessary to decide, for, even if its correctness be conceded, it seems to us that there is another feature in the case which makes the defense of fraud unavailable. It must be remembered that the executors of the elder Eschmann are not relying on fraud practiced directly on him, but upon fraud practiced upon his

son. If, upon the one hand, they may rely upon fraud practiced upon the son, it likewise follows that they may be bound by the son's conduct in condoning or waiving the fraud. Misrepresentation of the circulation of "The American Educational Review" is the principal element of fraud relied on. Young Eschmann admits that "not very long after Mr. Patterson received the note" he obtained the information from Patterson that the circulation of the magazine was not 32,000, but somewhere between 5,000 and 7,000. While he is not exactly certain as to the time, he says that he is sure that the information was imparted by Patterson in a conversation which occurred in the year 1911. On January 23, 1912, Dingwall executed to young Eschmann certain notes aggregating $5,200.00, which were endorsed by Eschmann and delivered to Patterson. In July, 1912, the two Eschmanns, Patterson and Dingwall, met at the office of Mr. Aplington, the elder Eschmann's attorney. Mr. Aplington's manner was such as to reflect on Patterson's good faith in the transaction. After Mr. Aplington left, the elder Eschmann apologized for Mr. Aplington's attitude towards Patterson and said that they had no complaint to make of him, but they had found Patterson was fair and had done everything he had agreed to do. After August 24, 1912, young Eschmann collected from Mrs. Houck the price of a scholarship, and kept the money under a claim of right to do so by virtue of his agreement with Patterson. It is the rule that a party to a contract obtained by fraud has but one election to repudiate or rescind the same. If he once determines his election, it is determined forever. Hence, if it is shown that he has at any time after knowledge of fraud, either by express words, or by unequivocal acts, affirmed the contract, his election is irrevocable. By clearly manifesting his intention to abide by the contract, he condones the fraud, and is without remedy. He cannot with knowledge of the fraud enjoy the benefits of the contract, and then file an action for deceit. Hartford Life Ins. Co. v. Hanlon, 139 Ky. 346, 104 S. W. 729; Smith v. Lewisport Bank, 27 R. 406. Here the younger Eschmann, after obtaining knowledge of the fraud, not only assured Patterson that he had acted in good faith, but endorsed notes for $5,200.00 for the purpose of carrying out the contract, and thereafter collected and retained money which he had no right to collect or retain except by virtue of the contract. Having, with knowl-

edge of the fraud, enjoyed the fruits of the contract, and having repeatedly affirmed the contract by other unequivocal acts, he has thereby condoned the fraud and neither he nor his father's executors will now be permitted to rely on that defense.

It appears that a draft for $2,500.00, drawn by Patterson on E. A. Eschmann on September 7, 1911, was paid on September 19. E. A. Eschmann claims that he got this money from his father for the purpose of paying it on the note and sent it to Patterson with the understanding that it should be credited on the note. It is insisted on the cross-appeal that the executors are either entitled to recover this sum from plaintiff or to have the sum credited on the judgment, in case of a finding in favor of plaintiff. In reply to the first contention, it is sufficient to say that, in view of our conclusions on the main features of the case, there is no basis whatever for a judgment in favor of the executors for the sum mentioned. The only remaining question to be determined is whether the amount of the draft should be credited on the judgment in favor of plaintiff. In support of this contention it is argued that Patterson was plaintiff's agent for the purpose of collecting the note, and that the payment to Patterson was, in effect, a payment to plaintiff. Without passing on the question whether the evidence is sufficient to show that the money was collected by Patterson with the understanding that it should be credited on the note, it is sufficient to say that we fail to find in the record any substantial basis for the claim that Patterson was in any sense plaintiff's agent in looking after the collection of the note. The evidence merely shows that plaintiff was looking to Patterson to see that the note was paid, because Patterson had discounted the note to plaintiff and was liable thereon as endorser. Since the payment was not made to plaintiff or his authorized agent, it follows that the judgment in favor of plaintiff should not be credited by the amount of the draft in question.

On the cross-appeal the judgment is affirmed. On the original appeal the judgment is reversed and cause remanded, with directions to enter judgment in conformity with this opinion.