## Strong et al. v. Abner et al.

(Decided May 11, 1937.)

FAULKNER & FAULKNER and W. E. FAULKNER for appellants.

C. W. NAPIER, NAPIER & NAPIER and H. C. JOHNSON for appellees.

OPINION OF THE COURT BY JUDGE CLAY—Reversing.

Walker Abner died at his home in Bowlingtown, Perry county, on May 4, 1928. He was a World War veteran, and was married twice after his return from service in the army. By his first wife he had one child, Iona Abner. By his second wife, Susie Hacker, formerly Susie Begley, he had two children, Lily Abner and Lucy Abner. Walker Abner was the owner of a small store, located near his home, some livestock and other items of personal property, together with several small tracts of land. On July 31, 1929, Susie Abner qualified as her husband's administratrix, and on October 30, 1929, brought suit to settle his estate. Walker Abner's landed estate was sold in that action to pay certain indebtedness asserted by Susie Abner and others. On September 26, 1932, an instrument of writing purporting to be the last will and testament of Walker Abner was lodged for probate in the office of the clerk

of the Perry county court. Objections to the probate
of the will were filed by Walker Abner's sisters, Clara
Abner Jenkins and Lula Strong, who claimed the right
to contest because of their being beneficiaries in a war
risk policy which Walker Abner carried on his life.
After a long hearing and some delay, the county court
probated the will. From that order the contestants,
Lula Strong and Clara Abner Jenkins appealed to the
Perry circuit court, where a trial was had resulting in
a verdict and judgment sustaining the will. The ver-
dict and judgment were set aside and a new trial grant-
ed. On the second trial nine of the jurors returned a
verdict sustaining the will, and contestants have ap-
pealed.

For the propounders Sherman Carmichael, who
prepared the will, Pete Bowling and Jesse Bowling,
whose names together with that of Beverly Clark, ap-
pear as witnesses on the will, all swear that they were
present at the home of Walker Abner on April 10, 1928,
and saw him execute the will. For the contestants the
evidence is as follows: Mrs. Strong and Mrs. Jenkins,
L. F. Brashear, D. H. Goodlette, and C. V. Cooper, all
of whom claimed to be acquainted with Walker Abner's
handwriting, testified that the disputed signature was
not in his handwriting. C. V. Cooper and D. H. Good-
lette, who also qualified as experts along with E. B.
Lovern and H. R. Thornton, after examining the dis-
puted signature and comparing it with Walker Abner's
signature on a note and mortgage and signature cards
in certain banks, gave it as their opinion that the dis-
puted signature was not written by Walker Abner. On
March 15, 1928, Walker Abner made a deed conveying
certain tracts of land to his three children. Mrs. Strong
testified that she was at Walker Abner's home April
30, 1928, and he told her that he had not willed anybody
anything. R. M. Fitzpatrick, attorney at law, testified
that sometime during the year 1932 Brown Begley, bro-
ther of Bob Begley, came to his house after Bob was
sick and said that he wanted him to bring his typewriter
and come over. He then went to Bob Begley's. Bob
and Susie Abner were there. Bob, in the presence of
Susie Abner, asked him about making a will. He said,
"If there is a will made, there will be some damned
dirty work done and I won't have anything to do with
it." He told Bob that if he wanted to make a will to

refer to Colwell's Form Book No. 2. Mrs. Maxine Walden testified that about the time of Robert Begley's death she visited Brown Begley's store. On opening the door she saw present Pete Bowling, Sherman Carmichael, Susie Abner, and Dall Begley. Sherman Carmichael, was doing some writing. When she came in they "gathered up their papers, kind of shuffled them around till nobody could see what they were doing." John Deaton, who claims to have been at Walker Abner's home on April 10th, never saw Pete Bowling, Jesse Bowling, Sherman Carmichael, Bev Clark, or Chester Sandlin there. Other witnesses, who saw Walker Abner shortly before his death, say that he referred to the fact that he had made deeds to his children, but said that he had made no will. In rebuttal Susie Abner, Pete Bowling, Sherman Carmichael, Jesse Bowling, John Dixon, Brown Begley, Emma Bowling, and others denied certain statements made by the witnesses for the contestants.

One of the main contentions of appellants is that the verdict is flagrantly against the evidence. In support of this position the following points are emphasized. Walker Abner made a deed to his children shortly before his death, and stated that he had made no will. After his death Susie Abner qualified as his administratrix and brought suit to settle his estate. According to some of the witnesses, Sherman Carmichael, Pete Bowling, Jesse Bowling, Beverly Clark, John Dixon, and Chester Sandlin did not meet at the home of Walker Abner on April 10, 1928. In the opinion of those who knew Walker Abner's handwriting, and of the experts who compared the handwriting with admitted signatures, the disputed signature is a forgery. Long after Walker Abner's death Susie Abner and her brother sought legal advice about the preparation of a will. Not only so, but there was evidence that Susie Abner, Pete Begley, Dall Begley, and Sherman Carmichael were at Brown Begley's and secretly engaged in preparing some papers. In addition to this it is claimed the disputed signature bears no resemblance whatever to the handwriting of Walker Abner. While the persuasive influence of the facts relied on must be conceded, there are certain potent facts that give another side to the picture. The most natural thing in the world for Walker Abner to have done would have been to give all that

he had to his wife and children. In addition to this fact we have the positive evidence of Susie Abner, Sherman Carmichael, Pete Bowling, Jesse Bowling, and John Dixon that they were present and saw Walker Abner write his name on the will in question. It is at once apparent that the case turns on which set of witnesses is to be believed, and that always is a question for the jury and not for the courts. We are therefore constrained to hold that the verdict is not flagrantly against the evidence.

While C. A. Noble was on the stand, he offered to testify that, while Susie Abner was in the next room, Bob Begley wanted to know if, in his opinion, a will would hold the property of the deceased, and he got the impression that Bob wanted to prepare a will conveying Susie Abner the property of Walker Abner, who was then deceased. The argument is that Bob Begley was the brother of Susie Abner, and she was near enough to hear the conversation. The difficulty with this position is that the witness himself, on being asked if Susie Abner was close enough to hear the conversation, replied, "I don't think so." Clearly, the exclusion of the offered evidence was proper.

The court refused to permit C. A. Noble to give his opinion as to whether the disputed signature was in the handwriting of Walker Abner. It was shown that Mr. Noble was a lawyer and that he had several cases involving the question of handwriting, and had also served as circuit court clerk. It is not the business of the circuit court clerk to know or identify the handwriting of parties to an action, or their attorneys, and that experience, even though it be supplemented by one's experience in the handling of a few cases involving the question of handwriting, is not sufficient to qualify one to testify as an expert on handwriting.

While H. R. Thornton and C. V. Cooper were on the stand they were asked to compare the signatures of Susie Abner with the signature on the alleged will, and then to state whether or not in their opinion the same person who signed the administratrix' bond, note, and mortgage, signed the name of Walker Abner to the alleged will. Formerly, proof of handwriting by comparison was not permissible. Andrews v. Hayden's Adm'r, 88 Ky. 455, 11 S. W. 428, 10 Ky. Law Rep. 1049, but, since the enactment of section 1649, Kentucky Stat-

utes, other handwriting of a person whose handwriting is in dispute is admissible for the purpose of comparison. In our opinion the statute deals only with the party whose handwriting is in dispute, and in a case of this kind applies only to the testator and not to some one else.

After Robert Fitzpatrick had testified that he had done some pension work for Mrs. Abner, counsel for propounders moved the court to exclude his evidence from the jury on the ground that he was Mrs. Abner's attorney and had also been adjudged by a court of competent jurisdiction incompetent to manage his own affairs. Counsel for contestants objected to the attorney's arguing the case to the jury in the form of an objection. In overruling the motion the court told the jury that they were the judges of the weight to be given the testimony; that no evidence had been introduced to the effect that the witness was incompetent and they should not consider that statement for any purpose. Thereupon the witness was asked if he did not know that he had been adjudged incompetent by the Perry county court and a committee appointed for him. Over objection he replied, "It was by orders of the Veterans' Bureau, because at times I am unable to handle money." Thereupon, the witness, over the objection of contestants, was required to read an order, dated September 10, 1934, reciting that this day came Cappie Fitzpatrick and executed in open court a bond in the sum of $3,000 as such committee, which bond was approved by the court. Counsel for the propounders then renewed their motion to exclude from the consideration of the jury all the evidence of the witness Fitzpatrick. The motion was overruled with the admonition to the jury that they should not consider the order appointing the committee for Robert Fitzpatrick for any purpose except to the extent that it might affect the value and the weight to be given to his evidence. Counsel for the contestants insist that the action of the court was erroneous, the argument being that the question of competency should have been addressed to the court on the voir dire, which was not done, and that all the evidence respecting the appointment of a committee should have been excluded.

It is true that whether a witness is mentally incompetent to testify is not a question for the jury, but

one exclusively for the court on the voir dire examination; City of Covington v. O'Meara, 133 Ky. 762, 119 S. W. 187; Owen v. Commonwealth, 181 Ky. 257, 204 S. W. 162; unless the incompetency appears from the testimony of the witness himself and perhaps in some cases where the fact is to be shown aliunde. Pease v. Burrowes, 86 Me. 153, 29 A. 1053. As the witness comprehended the obligation of an oath and gave a rational account of the matters concerning which he testified, it is clear that the court did not err in holding that the appointment of a committee did not require the exclusion of the evidence on the ground of incompetency.

But counsel for contestants insist that the court erred in permitting any evidence, whether in the form of an admission, or of a record, tending to show that a committee had been appointed for the witness, to go to the jury. Though, in view of the intelligence of the witness, the appointment of the committee was not sufficient to require the exclusion of his evidence on the ground of incompetency, yet as it was a finding of mental incapacity, Kentucky Statutes, secs. 2149, 2151, 2155; Sabin v. Commonwealth, 233 Ky. 636, 26 S. W. (2d) 506; Downing v. Siddens, 247 Ky. 311, 57 S. W. (2d) 1; and therefore bore on the credibility of the witness, we think the evidence, accompanied by the admonition of the court, was properly admitted. Pease v. Burrowes, supra; Territory v. Padilla, 8 N. M. 510, 46 P. 346; Reginia v. Hill, 5 Cox, Cr. Cas. 259, 5 Eng. Law & Eq. 547; District of Columbia v. Armes, 107 U. S. 519, 2 S. Ct. 840, 27 L. Ed. 618.

We find no merit in the contention that the evidence of Fitzpatrick should have been excluded on the ground that it related to a communication between attorney and client. The protection which the law affords to communications between attorney and client, has reference to those which are legitimately and properly within the scope of a lawful employment. It does not extend to communications made in contemplation of the future commission of a crime, or perpetration of a fraud. Standard Fire Ins. Co. v. Smithhart, 183 Ky. 679, 211 S. W. 441, 5 A. L. R. 972; Cummings v. Commonwealth, 221 Ky. 301, 307, 298 S. W. 943. The conversation which the witness detailed related to the preparation of a will after the death of Walker Abner. It was therefore made in contemplation of the future com-

mission of a crime, and of the perpetration of a fraud, and falls within the exception to the rule that communications between attorney and client are privileged.

Among the grounds urged for reversal is the misconduct of counsel in his closing argument to the jury. In disposing of the question we shall consider only a few extracts illustrating the kind of speech that was made:

"And that same little C. V. Cooper swore that this wasn't the signature. Yes sir, I wish to God some of you men knew C. V. Cooper. C. V. Cooper, the man who grew so rich in one night that he became able to go over there across the street and purchase the finest brick building on Main Street in one night, purchased and held that as the property of his brother-in-law,W . M. Pursifull; he woke up one morning worth $40,000.00, and he never had earned enough bread and butter in his life hardly to keep him from starving, but within one night becomes rich, that is the kind of a man this is who swears to you as an expert witness that the man who signed this instrument never signed it." * * *

"You take Leonard Brashear, you take Cooper, around here year after year, living fat, has grown immensely rich overnight, buys large property and has large holdings on the main street in Hazard, worked in the banks all these years, tell me why those banks have gone broke and thousands have gone hungry, just like those orphans will go hungry under the guidance of men of that type, will go hungry for bread, yet that man Cooper, just in the flash of an eye, said, 'That is not a genuine signature of that dead soldier.' Are you going to accept that kind of evidence? Are you going to turn down the evidence of straight, honorable, trustworthy persons?" * * *

"Mr. Faulkner, and Mr. Duff and Mr. Holliday and Mr. Combs, and Mr. Strong and Mr. Fitzpatrick, why didn't you bring that witness you say rode down the road with these men? What are you trying to do? They are trying to use such testimony as that for what purpose? To take the hard earned money from these poor, helpless children and divide it up with Green Holliday, and with Er-

nest Faulkner and with Bob Fitzpatrick and Floyd Duff and Zack Duff, divide it up with them, have a fine time, and they are going to do that upon the testimony of old man John Deaton.'' * * *

"But they held a caucus back there, the Duffs and Hollidays and Fitzpatricks and Faulkners, and they said to Ernest Faulkner, 'You are the speaker of the house. You go in there and don't call Susie a bad woman, but you say enough to make the jury think she is a bad woman.' I am ashamed of you, ashamed of every one of you. I would hang my head in shame and shuffle out of this court house and pray to God to pardon me for that awful sin. You don't know what you did, do you? Strong men, Floyd Duff, a man of power, comes here and they have got Ernest Faulkner up here trying to tell this jury that this little woman, that blessed mother, is nothing but a common whore. Not only blacken the name of that little mountain girl, the daughter of old Squire Begley, but try to blacken the name of poor little innocent Iona, trying to blacken the name of those little children. Look at them. See them over there? Trying to blacken their names, and send them to their graves in dishonor and disgrace.'' * * *

"Let's see what else. What are they trying to do? This great band of conspirators.'' * * *

"I say unto you, it doesn't behoove the Duffs, the Faulkners, or Fitzpatrick or anybody else to come to this courthouse and try to defame the good name of that blessed little woman, but for gold and silver they would defame the name of anyone, they would take any advantage on this earth of anyone.'' * * *

"I ask of you and beg you not to be a party to this great band of conspirators and let them leave this court room and go across that street, go in and take a cold drink, buy big fat cigars, have a nice time, and send those little children back home barefooted to cry for an education, to cry for meat and bread, lie there and suffer and dream about their daddy. Let them lay there and suffer. If you want to do that, you can take Faulkner's expert witnesses and take this money from these blessed little children. I don't think you will do it.''

"Now, they say render a verdict on their side because Ance Bowling, who the Government of the United States of America relieved out of the post office down here at Buckhorn a few days ago, Ance Bowling, who was relieved from the services of the United States, out of the post office, and he knows why." * * *

"No court in the land or world can take from these poor children and this woman this gold and silver except these twelve men who sit before me. No court will ever be strong enough, your verdict will settle this forever. This verdict has been determined and settled by twelve honest men, and the same evidence and circumstances, I submit to you for your judgment, and I am today asking for the same verdict as I got a few days ago." * * *

Counsel for contestants interposed numerous objections to the argument, and moved to set aside the swearing of the jury. The only action taken by the court was to admonish the jury not to consider the reference to the verdict on the other trial.

There was no evidence, and none could have been offered that C. V. Cooper had become rich in one night, or that he had worked in banks which had gone broke and thousands had gone hungry. There was no evidence and none could have been offered that Mr. Faulkner, Mr. Duff, Mr. Holliday, Mr. Combs, Mr. Strong, and Mr. Fitzpatrick were trying to take the hard-earned money from the poor helpless children, and divide it up with Green Holliday, Ernest Faulkner, Bob Fitzpatrick, Floyd Duff, and Zack Duff. There was no evidence and none could have been offered that the Duffs, Hollidays, Fitzpatricks, and Faulkners held a caucus and said to Ernest Faulkner, "You are the speaker of the house. You go in there and don't call Susie a bad woman, but you say enough to make the jury think she is a bad woman." There was no evidence and none could have been offered that there was any conspiracy on the part of the parties mentioned to send little children back home barefooted. Though the court sustained an objection to the introduction of any evidence on the subject, counsel for propounders went outside the record and himself stated that Ance Bowling had been relieved from the service of the United States and he knew why. Not only so, but, notwithstanding the fact that

the court sustained an objection to any evidence as to what occurred on the first trial, counsel himself became a witness and told the jury what had occurred.

It is unnecessary to review the authorities. We have ruled repeatedly that it is improper for counsel to make an inflammatory argument, or to make statements of fact not in evidence calculated to warp the judgment and excite the passions of jurors. The latest expression of the court may be found in Strother v. Mc-Clave, 264 Ky. 121, 94 S. W. (2d) 310, 311, where we said:

"In the heat of argument, fervor and partisanship are to be expected, and, within their proper field, they may constitute a virtue. Great latitude must and should be allowed counsel in making their arguments to a jury on the issues tried, and all reasonable deductions from the facts adduced in the testimony may properly be made. But this latitude cannot be extended to permit counsel to go outside the record and bring to the attention of the jury matters which have no bearing whatever upon the questions in issue, with an obvious purpose to inflame their passions and incite their prejudices. It would be useless to caution jurors in the progress of a trial against listening to, or participating in, conversations out of the court room, in regard to the merits of the case on trial if they are to be permitted to listen in the jury box to arguments or statements of fact neither in evidence nor in issue, calculated to warp their judgment and to excite their passions. Louisville & N. R. Co. v. Crow, 107 S. W. 807, 32 Ky. Law Rep. 1145. Odious or unpopular persons are no less entitled to even justice than are ordinary citizens. If it were otherwise, our liberties would be illusory. Counsel should not need to be told that the scope of argument does not include matters, outside of the cause tried or that it does not include testimony given by themselves when not under oath."

The rule is peculiarly applicable to the facts of this case, and there is no escape from the conclusion that the argument was prejudicial.

We find without merit the other grounds urged for reversal.

The right of appellees to contest the will is not altogether clear from the record, but it seems to have been admitted. On another trial that question should be more fully developed.

In their brief counsel for appellees have discussed the propriety of the trial court's action in granting the new trial, after the first verdict, but the record has not been prepared, nor the case practiced, in such a way as to bring that question before us for review.

Judgment reversed and cause remanded for a new trial not inconsistent with this opinion.