**SANFORD CONSTRUCTION COMPANY, Inc., Appellant,**

v.

**S & H CONTRACTORS, INC., Appellee.**

Court of Appeals of Kentucky.

June 6, 1969.

William J. Parker, Harlin, Parker,
Ricketts, Lucas & English, Bowling Green,

Harry Kottler, Daus, Schwenger & Kottler, Cleveland, Ohio, for appellant.

Paul R. Huddleston, Huddleston & Huddleston, Bowling Green, for appellee.

STEINFELD, Judge.

Appellant, Sanford Construction Company, Inc. (hereafter Sanford) was engaged as general contractor to develop land and construct a shopping center thereon. Sanford contracted with S & H Contractors, Inc. (hereinafter S & H) to excavate and grade the land. Claiming that Sanford fraudulently induced S & H to enter into the contract at a grossly inadequate price S & H sued Sanford and others for $125,000.00 damages in what S & H described as an "action in deceit" and as "founded on a tort involving misrepresentations as to the nature and extent of underlying rock at the shopping center site." All defendants below except Sanford escaped liability, but on trial a jury returned a verdict against it in the amount of $75,000.00. Motions for a new trial and for judgment notwithstanding the verdict were overruled and judgment was entered pursuant to the verdict. Sanford appeals.[1] We affirm.

Forest City Enterprises, Inc., the owner, and Sanford engaged licensed experts to prepare plans and specifications for improvements of the site and construction of the building. A booklet entitled "Site Improvement Specifications for Bowling Green Mall at Bowling Green Kentucky" with the plans was delivered by David Wakser (an officer of Sanford) to various companies, including S & H, as an invitation to bid on the various phases of the project. The booklet and plans were prepared by Keeva J. Kekst and Ernest Ross, architects for Forest City Enterprises, Inc. and Sanford Construction Co. Among other things, the booklet contained a section entitled "Information to Bidders" which included the following:

"Bidders are required to satisfy themselves by personal examination of the contract documents and investigation at the site of the work as to the condition existing and the difficulties likely to be encountered in the construction of the work.

"No plea of ignorance of conditions that exist or that may hereafter exist, or of conditions or difficulties that may be encountered in the execution of the work as a result of failure to make such examination and investigation will be accepted as an excuse for any failure or omission on the part of the contractor to fulfill in every respect, all the requirements of the contract, nor will the same be accepted as a basis for any claim whatsoever for extra compensation, or for an extension of time.

"Bidders are required to verify all data to their satisfaction and to satisfy themselves as to the character of the material and conditions to be encountered. Owners and Engineers will not assume responsibility for exactness or interpretation of any subgrade data furnished."

\*      \*      \*      \*      \*      \*

"Neither the general contractor nor the Project Superintendent are to be responsible if, upon the completion of the work, the actual quantities are found to be greater or less than the estimated quantities. The Sub-Contractor shall make no claim for anticipated profits or loss of profits because of a difference between the actual and estimated quantities."

Under the heading of general conditions two sections read:

"6—RESPONSIBILITY OF THE CONTRACTOR

The Contractor shall take all responsibility for the work, shall bear all losses

---

1. S & H did not cross-appeal.

resulting to him on account of the amount or character of the work, or from any unforeseen obstructions or difficulties which may be encountered, or because the nature of the land in or on which the work is done is different from what is assumed or was expected, or on account of the weather, floods or other causes; then he shall assume the defense of, and indemnify and save harmless the Owner from all claims of any kind arising from the performance of the Contract."

## "18—ESTIMATED AND ACTUAL QUANTITIES

The estimated quantities of the various classes of work to be done under this Contract are approximate, and are for the purpose of comparing, on a uniform basis, the bids offered.

Neither the Owner nor the Engineer are to be held responsible if, upon the completion of the work, the actual quantities are found to be greater or less than the estimated quantities. The Contractor shall make no claim for anticipated profits or loss of profits because of a difference between actual and estimated quantities."

"Detail provisions" stated: "If the bidder desires to obtain information as to soil conditions, the Owner will afford him an opportunity, at his own expense, to make borings or to dig test pits on the site of the work." A section relating to "Grading and Excavating" provided:

"b. *Sub-surface soil data:* Subsurface investigations have been made and the results shown on the drawings. This information was obtained primarily for use in preparing the Foundation design, but the Grading Contractor may draw his own conclusions therefrom. No responsibility is or will be assumed by the Owner, General Contractor or Engineer for subsoil quality or conditions other than at the locations and at the time the exploration was made. No claim for extra compensation, or for extension of time, will be allowed on account of subsurface conditions inconsistent with the data shown, except as may be permitted elsewhere herein."

Dallas Sandlin and Ray Hanser, officers of S & H, received the material from Wakser between Christmas 1965 and March 1966. They testified that as he handed it to them he stated: "* * *. The plans and specifications have been spelled out for you; you got the borings indicating your rock elevations; you got a complete picture of the work to be done, and this is all you need to complete the job. We would like a price on it at your convenience." At the same time he said: "* * * that all the information that [S & H] needed to calculate any subsoil rock that was to be encountered could be calculated from the plans, in fact, was all [S & H] needed to calculate the job." Also "Here's the plans and specifications to do the Bowling Green Mall by. You boys will not have nothing to worry about. Everything will be all laid out for you to do the job by." The plans indicated that boring had been made over only part of the land and in a grid pattern at 100 foot intervals. The soil profile lines of the area explored showed the depth of the borings. No tests had been made in certain areas where there were visible rock outcroppings but the plans required that cuts be made at those places.

From those plans S & H originally estimated for Sanford that it could do the work for $94,000.00. Later it began a site investigation which included a ground inspection of the entire area during which it observed rock outcroppings. It used a backhoe for exploration purposes in the area which the plans showed had not been bored and possibly in other areas. With a rod it probed in various places. It discovered larger quantities of subsurface rock than it had anticipated. On May 18, 1966, it contracted to do the work for $104,000.00 agreeing that: "S & H has thoroughly examined the plans and specifications and the site has been visually ex-

amined to corroborate if there are any deviations between the prints, specifications and the actual site. Any deviations have been included in the contract price."

On May 23, 1966, S & H began working and spent approximately two weeks clearing the site of brush and other debris and stock-piling top soil. Next it moved dirt from and to areas selected by the project superintendent and finally it blasted rock, keeping a minute check and record of exposed rock to correlate the work with the site plans. Hanser detected some discrepancies between what he found and what the plans showed. He testified that this was not unusual and that "it wasn't apparent immediately that there was a great discrepancy or that it even would be a discrepancy." Finally it became obvious that the estimates which were furnished to S & H were not realistic.

S & H claimed that it was entitled to additional compensation and before completing all the work it attempted to adjust the matter with representatives of Sanford and Forest City but was unsuccessful. The engagement was substantially completed by November 1966 and shortly thereafter S & H sued[2] for an additional $125,000.00. At the conclusion of claimant's evidence a motion by Sanford for a directed verdict was overruled and at the conclusion of all evidence the motion for a directed verdict was renewed and again overruled.

The first trial error claimed is that S & H failed to prove all "six elements" necessary to establish its claim of fraud. We said in Cresent Grocery Co. v. Vick, 194 Ky. 727, 240 S.W. 388 (1922):

"We have adopted the general rule that an action cannot be maintained for fraud or deceit unless it be made to appear (1) that defendant made a material representation; (2) that it was false; (3) that when he made it he knew it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with intention of inducing plaintiff to act, or that it should be acted upon by the plaintiff; (5) that plaintiff acted in reliance upon it, and (6) that plaintiff thereby suffered injury."

"Although the alleged representation was made by defendant, if it was not material, or was not false, or defendant did not know it was false, and did not make it recklessly in disregard of the truth, or did not make the representation intending that plaintiff should be induced to act upon it; or, if plaintiff was not induced to and did not act upon the representation, or if he did so without injury or loss resulting to him, no cause of action exists in favor of the plaintiff."

Appellant cites McGuffin v. Smith, 215 Ky. 606, 286 S.W. 884 (1926).; Scott v. Farmers State Bank, Ky., 410 S.W.2d 717 (1967) and Collins-Moore & Co. v. Clement, 256 Ky. 731, 77 S.W.2d 1 (1934), and argues that failure to prove any of the foregoing six requirements will defeat recovery. The two officers, experienced in excavating and earth moving, who represented S & H acknowledged that they had received the site plan and specifications before it bid the job; that they read the material and fully understood and that they made an investigation. Sanford insists that because the plan showed the test holes were dug approximately 100 feet apart it was apparent that they were never intended to portray existing subsurface rock. S & H denies this. Mr. John Hageman of Geologic Associates, Inc. (hereinafter Geologic) testified that the purpose of the investigation which it made for Forest City was to determine the general subsurface rock forma-

---

2. The complaint and Sanford's answer did not follow the style of pleading required by CR 8.01 but used the code concept of pleading which was abandoned more than 15 years ago. 6 Ky. Practice, Clay 128. Such pleading is condemned but no motion to strike the pleadings was made.

tion for proper foundation design for buildings.

S & H claims that it proved all of the elements of fraud by direct or circumstantial evidence, that it relied upon material furnished and representations made by Wakser simultaneously with the delivery of that material. Proof showed that reports made by Geologic which were in the possession of Sanford and which were not furnished to S & H contained subsurface information inconsistent with the plans. One test hole referred to in the report did not appear. According to S & H there was " * * * an average discrepancy of 1.98 almost 2 feet" of subsurface rock. Sandlin testified that the plans misstated rock levels at 32 of the 37 boring points, all adverse to claimants. He said that two holes were omitted and all others shown on the plans were misplaced, several by 50 to 60 feet. Also that contour lines on the topographic survey were incorrect because 107 of the 116 points were erroneous from 15 to 25 feet. Testimony disclosed that incorrect information was furnished pertaining to "discontinuous rock outcroppings", estimates as to fill material which would be required, anticipated need for blasting and substantial face of rock which would be produced. Wakser failed to tell that Geologic's report showed that 74,000 cubic yards of dirt would be needed for filling and that there were only 26,000 on the site. Hatchered areas shown on the report were not revealed by the plans given S & H. He admitted he did not give S & H all of the information he had—"he didn't think it was necessary." S & H claims that withholding data and furnishing incorrect information caused it to grossly underestimate the quantities of rock and dirt.

■ Evidence showed that the topographic survey was correct, but there was ample testimony indicating that the plans were at gross variance with the report made by Geologic to Sanford and that Wakser had withheld information vital to S & H in preparing its bid. Testimony in-

dicated that Wakser's statement to S & H that he had furnished " * * * all the information that (S & H) needed to calculate any subsoil rock that was to be encountered could be calculated from the plans * * * " and that he had furnished " * * * all (S & H) needed to calculate the job" was false. The instructions to the jury properly submitted this issue and it found against Sanford.

■ Sanford points to the writings from which we quoted in this opinion and insists that S & H contracted against recovering more than the contract price. " * * * (F)raud in the inducement of or preliminary negotiations to a written contract is not ordinarily merged in the contract * * * to preclude an action for fraud." 37 Am.Jur.2d 524, Fraud & Deceit, Sections 387–388. Cf. Isaacs v. Cox, Ky., 431 S.W.2d 494 (1968). Sanford contends that S & H made an examination of the site, after it " * * * had been afforded every opportunity to discover the truth * * * " therefore it " * * * could not be regarded as having relied on the * * * representations so as to be entitled to recover on the ground that the representations were false." It cites Prosser on Torts (3rd Ed.) p. 729, wherein it is said:

"If, after hearing the defendant's words, he makes an investigation of his own, and acts upon the basis of the information so obtained, he may be found not to have relied on the defendant, since the fact that he was unwilling to accept the statement without verification is evidence that he did not believe it."

Above are five quotations, each a caveat to the bidder to conduct its own investigation, to verify the data on which it will submit its bid, and not to rely upon the information furnished. These acts repel the idea that there was an effort to deceive. Fauntleroy v. Wilcox, 80 Ill. 477 (1875).

■ The warnings and invitations to this skilled partnership accompanied the data

of which S & H complains and delivery was simultaneous with the statements by Wakser to the effect that the information furnished was all that was needed. While the alleged misrepresentations were antecedent to the contract so were the warnings. Can S & H contend it was induced to bid at a lower figure by what Wakser said and furnished but that it was not required to heed the caveats and the statements of the purpose for which Sanford obtained the information furnished by Geologic and the engineers? Were it not apparent that Wakser's deception influenced S & H in its investigation we would hold that S & H which was thoroughly experienced in this work, could not disregard the warnings and at the same time rely upon the reports. Ripy v. Cronan, 131 Ky. 631, 115 S.W. 791, 21 L.R.A.,N.S., 305 (1909). It knew of uncertainties and risks involved in rock extraction and earth moving, therefore, it had reason to make its own tests so it investigated, but only to the extent it considered necessary. Cudahy Packing Co. v. Narzisenfeld (1924, CA 2d) 3 F.2d 567. All Florida Land Co. v. Thomas Manors, Inc., 136 Fla. 211, 186 So. 416 (1939), expresses the tests to be applied when the claimant is experienced in the activity, and it claims fraud. We quote:

"In the first place, the case was litigated on the wrong theory. There was a studied attempt to apply old rules to a modern aspect and they could not be made to synchronize. If grandma's old buggy mare had been on the block for sale and the members of the missionary society present to bid and purchase, the episode would have clicked but the rules of law and ethics governing a transaction like that have little application to the guaranties involved in a speculative transaction such as the sale of oil leases. In fact, buying leases in oil wells, and oil lands is, though legitimate, one of the most hazardous and highly speculative businesses in which one can engage. Judged by the numerical history of successes and failures in this field, poker and horse racing can give it Aces and Spades and then win one hundred to one, perhaps better. One trading in such a commodity is presumed to know this and to know that his judgment as to when a well will come in, what it will produce, or how long it will produce is worth about as much as that of the man who offers the stock or the lease for sale.

"We do not mean to imply that there are not signs and symbols by which one versed in the oil business may tell that there is a possibility of oil in certain areas and that a prospective well will produce oil but even these are speculative and any representation based on them is speculative and of uncertain value. Any guarantee as to what's in a drilled hole three thousand feet deep, or what's coming out of it, or how long it will continue to come is based on nothing more tangible than hope and one buying oil leases is presumed to know this. One embarking in a speculative field must litigate under the rules there controlling. He will not be permitted to barter in a speculative field and then if he lose, litigate his cause in reliance on guaranties pertinent to the sale of nonspeculative commodities."

With respect to the duty to investigate and the legal effect of the investigation it is said in 37 C.J.S. Fraud §§ 102, 408 that " * * * but where the person who claims that he was defrauded made an investigation that was free and unhampered, and conditions were such that he might have obtained the information desired, or if the facts were obvious to him as to the person making the representation, and the means of knowledge equal, he is presumed to have relied on his own judgment and not on the representation. The presumption is not conclusive nor a presumption of law." The jury was instructed to consider whether S & H bid "in reliance on the data presented by the plans and specifications provided by * * * Sanford * * *". We cannot fault it for having concluded that

S & H did so for there was substantive evidence which sustained that verdict.

In 174 A.L.R. 1010 is an annotation entitled "Fraud Predicated upon Vendor's Misrepresentations of Physical Condition of Real Property." (The case before us does not involve a sale but we see no reason why the same rules should not apply if the circumstances were substantially the same.) At page 1028 it is stated:

"In measuring the right to rely upon representations, every person must use reasonable diligence for his own protection. Where the means of knowledge are at hand and are equally available to both parties, and the subject matter is equally open to their inspection, if one of them does not avail himself of those means and opportunities, he will not be heard to say that he was deceived by the other's misrepresentations."

In the same annotation in 174 A.L.R. at page 1038 we find:

"In this connection there is a doctrine which has received the approval of a substantial majority of the courts to the effect that if a purchaser makes a personal investigation which is free and unhampered and the conditions are such that he must obtain the information he desires, he is presumed to rely upon his own investigation rather than on representations made to him by his vendor."

These rules are supported by Kentucky cases cited in that annotation.

The subject of reliance on misrepresentations was discussed rather extensively in Baylies v. Vanden Boom, 40 Wyo. 411, 278 P. 551, 70 A.L.R. 924 (1929). It said:

"After a careful review of both English and American authorities on the subject, the court, in Omar Oil & Gas. Co. v. Mackenzie Oil Co., supra, [14 Del.Ch. 36, 120 A. 852; Id. (Del.Sup.) 3 W.W.Harr. 259, 138 A. 392] states its conclusions thus:

'Relative to false representations, as a ground of defense, there is one fundamental rule, agreed upon by all the authorities, viz., that a buyer shall not be precluded from relying on such representations unless it clearly appears that he relied on his own investigation, and not on the representation. Mr. Pomeroy, at section 895, note 4, states it thus:

"The question is, Did the party rely on the representation or on his own knowledge? To obviate the effect of the representation, it must be clearly and conclusively shown that he relied on his own knowledge. This, the general doctrine and the qualifications both demand."

'* * *. The better and more reasonable doctrine, the one consistent with the fundamental rule, and supported by the majority of well-considered cases, including those in Texas, is this: The buyer will not be prevented from availing himself of false representations of the seller, unless he makes an investigation on his own account and it is of such character as to fully acquaint him with the essential facts. If the buyer made an investigation that was free and unhampered, and conditions were such that he must have obtained the information he desired, or the facts he seeks to know were as obvious to him as to the seller, and their means of knowledge were equal, he is presumed to have relied on his own investigation, and not on the representation. In such case he could not have been misled by the seller.'

"See, also, Laird v. Keithley (Mo.Sup.) 201 S.W. 1138; Hoyt v. First National Bank (Tex.Civ.App.) 247 S.W. 637; Sullivan v. Helbing, 66 Cal.App. 478, 226 P. 803; 26 C.J. § 75, p. 1164."

Farrar v. Churchill, 135 U.S. 609, 10 S. Ct. 771, 34 L.Ed. 246 (1889), held that: "If the purchaser investigates for himself, and nothing is done to prevent his investigation from being as full as he chooses, he cannot say that he relied on the vendor's representations."

In 37 Am.Jur.2d 306, Fraud and Deceit, section 230 we find:

"One is not entitled to relief on the ground of false representations where, instead of relying upon them, he relies on his own knowledge or resorts to other means of knowledge, as, for example, where he relies on his own judgment or investigations, on his own examination of the property involved, on the advice of other persons, or on information obtained from them."

In O'Brien v. Marvin, Ky., 387 S.W.2d 282 (1965), there was a sale of real estate which had been damaged by fire, some of which damage the purchaser had observed on several visits to the house. We held that the purchasers "* * * had information of the fire and had more than one opportunity to examine the house and discover the damage of which they complain"; that "Having chosen to rely on their own examination, they were properly denied the right to rely on any fraudulent representations or suppression of fact." Cf. Annotation 61 A.L.R. 537.

Jerry Bratcher, the operator of the backhoe, testified that he dug approximately 59 to 60 holes all over the property and he described the various areas in which the digging took place. On cross-examination he said that it took him only about 2½ hours "he guessed" which S & H argues destroys the value of the testimony. Nevertheless, his testimony shows that there was an investigation. Hugh Causey who was in the excavation business and who owned the backhoe corroborated Bratcher's testimony and stated that the diggings "* * * were scattered all over the site. We just dug where they said dig." He explained that he was referring to Mr. Sandlin who told him where to dig. Causey also stated that he advised Sandlin generally and that "* * * he'd better know what he was doing in, on the rock in this area" to which Sandlin replied that he had a good blasting man who could do the job.

Hanser said his company engaged C. E. Whelin, the head of another contracting company which builds highways and dams, to go to the site with Sandlin and that they went there, made an investigation and reported to him. Sandlin stated that he walked the site over, looked at the terrain and the trees and saw some visible outcropping of rock. He made three visits to the site before entering into the contract. Whelin was with him on one of those visits. He said that the backhoe operated by Causey dug 20 to 25 holes, however, on deposition given before trial he deposed that 50 to 60 holes all over were dug. He explained his purpose in inspecting the site was to see how many trees were on it and "* * * what it was going to cost to clear the property and burn the brush and everything" but he admitted that on his third visit it was "* * * to see how much rock was on there." He contended, however, that his exploration of the subsurface was only in the area where the plans showed there had been no drilling and that he relied on the plans.

Our rule is that "[t]he burden is on the party asserting fraud to establish it by clear and convincing proof. Rice v. Hord, 252 Ky. 469, 67 S.W.2d 715 [1934]; Terrill v. Carpenter, D.C., 143 F.Supp. 747, affirmed 6 Cir., 249 F.2d 142." O'Brien v. Marvin, Ky., 387 S.W.2d 282 (1965). The proof is clear that vital information was withheld and erroneous data furnished, but the investigation made by S & H clouds the issue of reliance, nevertheless, there was sufficient proof which convinced the jury that Wakser caused S & H to omit more extensive inquiry. It was not precluded from recovery because of the investigation. Cf. Singleton Adm'r v. Kennedy, 18 Ky. (9 B.Mon.) 222 (1849), and 37 C.J.S. Fraud § 34d, p. 281. Whether it "* * * finally acted on (its) own judgment or (Wakser's) representations was a question for the determination of the jury." Morrow v. Bonebrake, 84 Kan. 724, 115 P. 585, 34 L.R.A.,N.S., 1147 (1911).

Appellant refers us to Miller v. Johns, 291 Ky. 126, 163 S.W.2d 9 (1942), and Depot Construction Co. v. State of New

York, 19 N.Y.2d 109, 278 N.Y.S.2d 363, 224 N.E.2d 866 (1967), to support its claim that the agreement was a "chancing contract" which is usually the case in excavation agreements. A similar contention was rejected in Highland Motor Transfer Co. v. Heyburn Bldg. Co., 237 Ky. 337, 35 S.W.2d 521 (1931), in which we held that fraudulent concealment, i. e., intentional suppression of material facts, destroys the "chancing contract" rule for "that rule applies only in cases where the difficulties encountered * * * could not reasonably have been anticipated by either of the parties to the contract." We held that " * * * the intentional suppression of facts * * * would give rise to an action of deceit." We find no merit in this claim. Cf. Woodmont, Inc. v. Daniels, 274 F.2d 132 (CA 10th, 1960); Murphy, Inc. v. Drummond, 232 F.Supp. 509 (E.D.Wis., 1964); affd. 346 F.2d 382 (CA7th 1966); Davis v. Com'rs of Sewage, 13 F.Supp. 672 (W.E.Ky.1936) and 37 Am.Jur.2d 317, Fraud and Deceit, section 238.

Sanford claims that S & H waived any right to sue for fraud, citing Central States Fire Insurance Co. v. Holland, 219 Ky. 727, 294 S.W. 489 (1927); Brenard Manufacturing Co. v. Stuart, 212 Ky. 97, 278 S.W. 586 (1925); Grigsby v. Draughn, 261 Ky. 717, 88 S.W.2d 964 (1935); Mackenzie v. Eschmann's Executors, 174 Ky. 450, 192 S.W. 521 (1917); Natural Rock Asphalt Corporation v. Carter, 221 Ky. 131, 297 S.W. 1114 (1927); Baltimore & Ohio R. R. Co. v. Jolly Brothers & Co., 71 Ohio St. 92, 72 N.E. 888 (1904) and Hampton v. Suter, Ky., 330 S.W.2d 402 (1959). In Hampton we wrote:

"Fraud inducing a contract may be waived by affirmance that is equivalent to ratification of the contract by the party who claimed to have been deceived into entering into it. That ratification may be shown by his acts after he acquired full knowledge of the real facts and had shown a clear intent to affirm the contract despite the fraud, as where he accepted the benefits thereof or acted in a manner inconsistent with repudiation. The intention may be in part shown by a failure to act promptly to repudiate the transaction. [citing cases]

Ordinarily, one claiming to have been defrauded into making a contract has an option either to disaffirm the contract and seek its recision or to affirm the contract and seek his remedy by an action for damages; he may not follow inconsistent remedies. [citing cases] He has but one election, and if he affirms the contract, his election is irrevocable and he condones the fraud."

▌ The discrepancies were not discovered until the work had progressed substantially. Within a reasonable time after finding "they had been greatly misled as to the amount" S & H protested to Sanford. Hanser testified that he went to see Wakser in Bowling Green but Wakser said " * * he was too busy to see me." Hanser then flew to Cleveland to see him where he again obtained no satisfaction. Shortly thereafter the excavation was completed, he said, so S & H removed its equipment, claimed and sued for additional compensation. Those acts were inconsistent with " * * * a clear intent to affirm the contract despite the fraud * * *". Hampton v. Suter, Ky., 330 S.W.2d 402 (1959). The applicable rule is stated:

"* * * According to the general rule supported by most of the courts considering the question, if the party complaining of the fraud has partly performed his contract before learning of the deceit practiced upon him, so that the contract * * * is not wholly executory, he will not be precluded from maintaining an action for damages for the fraud, even though he goes ahead and completes his contract, although the rule is said to be to the contrary with respect to rescission. Thus, where the defrauded party has performed substantially before discovering the fraud, he may go on with the performance and also recover damages. * * *" 37 Am.Jur.2d 538,

Fraud and Deceit, section 395. See also: 37 C.J.S. Fraud § 69d, p. 366. Anno.: Fraud—Waiver by Acts under Contract, 13 A.L.R.2d 807, 815, 846.

Also see United States v. Atlantic Dredging Co., 253 U.S. 1, 11–12, 40 S.Ct. 423, 425, 64 L.Ed. 735 (1920); Woodmont, Inc. v. Daniels (CA 10th) 274 F.2d 132, 139 (1960); Palmberg v. City of Astoria, 101 Or. 224, 199 P. 630, 16 A.L.R. 1125, 1131 (1921) and Hartwell Corp. v. Bumb (CA 9th) 345 F.2d 453, cert. den. 382 U.S. 891, 86 S.Ct. 182, 15 L.Ed.2d 148 (1965). However, to the contrary is Nounnan v. Sutter County Land Co., 81 Cal. 1, 22 P. 515, 6 L.R.A. 219 (1889).

Appellant contends that it cannot be held liable for acts of independent contractors. It is not being so held. S & H bases its claim on the misrepresentations and concealment of Wakser, the president of Sanford.

■ Next it complains that counsel for S & H in closing argument made statements not supported by the evidence and that its objection was erroneously overruled. The statements were that in applying for a construction loan Sanford represented to the bank " * * * that the excavation and grading * * * would exceed $300,000. * * * (that there remained in bank out of the proceeds of the loan a balance of $183,000.) and if they can prevent these boys from getting it, they can draw it out and put it in their pockets. The job is finished. It is paid for, for everybody else. And the money is still there. Why?" The appellant notes that Wakser testified " * * * that the cost of grading and excavating * * * was estimated at $117,000." He admitted that the " * * * total amount of the loan has not yet been disbursed * * *" and that "There is a small balance." Asserting that counsel cannot argue to the jury that which is not contained in the record or fairly discernible from the evidence of the case appellant cites Warren v. Nash, 24 Ky.Law Rep. 479, 68 S.W.

658 (1902); Hurst v. Williams, 31 Ky. Law Rep. 648, 102 S.W. 1176 (1907); Wells v. King, 219 Ky. 201, 292 S.W. 777 (1927); Strong v. Abner, 268 Ky. 502, 105 S.W.2d 599 (1937); Coombs Adm'r v. Vibbert, 289 Ky. 463, 158 S.W.2d 957 (1942).

Appellee responds and we find that no objection was made. The failure to timely object is a waiver. Rodgers v. Cheshire, Ky., 421 S.W.2d 599 (1967); Parker v. Redden, Ky., 421 S.W.2d 586 (1967) and Moore v. Lyons, Ky., 386 S.W.2d 717 (1965).

Appellant argues that the court erred in failing to advise the jury before it reached its verdict that Forest City Enterprises, Inc. had been dismissed as a party defendant. After the verdict was returned the court informed it that Forest City Enterprises, Inc., had been dismissed on order of the court. The gist of the complaint is that counsel for S & H had " * * * repeatedly brought to the jury's attention the fact that Forest City Enterprises, Inc. was a large, publicly held corporation comparable to General Motors." Appellant relies on J. C. Penney Co. v. Robison, 128 Ohio St. 626, 193 N.E. 401, 100 A.L.R. 705 (1934), in which it was said:

"Under our law it is just as pernicious to submit a case to a jury and permit the jury to speculate with the rights of citizens when no question for the jury is involved, as it is to deny to a citizen his trial by jury when he has the right."

Appellant also notes that in Sparks v. Maeschal, 217 Ky. 235, 289 S.W. 308 (1926) and Jones v. City of Bowling Green, Ky., 354 S.W.2d 749 (1962), we held that it was highly prejudicial and gross misconduct to argue that the defendant " * * * is a rich and powerful corporation."

■ Appellee responds that the appellant failed to make timely objection to this line of argument and that the instructions " * * * indicated to the jury that Sanford Construction Company, Inc. was the defendant." The record shows that ob-

jection was timely made but the instructions referred to Sanford many times and never to Forest. They were framed in a manner which authorized a recovery by the plaintiff or a denial thereof. The verdict read "We the jury find for the plaintiff in the amount of $75,000.00." There is nothing to indicate that the jury verdict would have been any different if the court would have told the jury that the claim against Forest City Enterprises, Inc., was being dismissed. We hold that appellant was not prejudiced by the late disclosure to the jury that only Sanford remained as a defendant.

Lastly, it is appellant's contention that the proof with respect to damages did not meet the required standard and that S & H " * * * cannot recover a speculative amount." It cites Spencer v. Woods, Ky., 282 S.W.2d 851 (1955), and many other cases, but it would serve no useful purpose to list them. They stand for the rules " * * * that uncertain, contingent and speculative damages cannot be recovered" and reasonable certainty in the establishment of damages by substantive evidence is required. Cf. Western Union Telegraph Co. v. Guard, 283 Ky. 187, 139 S.W.2d 722 (1940).

Appellant argues that the records kept by S & H were inadequate and did not support the claim or the verdict, and it places great emphasis on the inability of S & H to show from where the excess rock came. Hanser admitted, "I told you I didn't have any records of exactly where any particular material came from at any particular given time for any particular reason." He admitted that he could not " * * * tell the jury precisely how much cubic yards of rock were removed from each of the areas shown on (the) map." Sandlin was asked and answered:

"Q. So you don't have any records then of the quantity of material used and the only thing you are doing is speculating by trying to re-compute from the time sheets, is that correct,

is that what you are telling this jury?

A. Yes that's—yes, that's a good way to do it."

S & H kept " * * * daily records of the quantity of material, rock, dirt, * * * " and other things moved on, onto and off the site by keeping " * * * track of the machines * * * what they were doing, each operator." Sandlin stated that from the time sheets and those indicating the type and size of the machines being used, he could " * * * figure up approximately how many yards of material a man uses."

Appellee responds that it attempted to introduce evidence " * * * to show the specific item and the aggregate of its loss * * * " but Sanford objected. The objection was sustained, therefore, it showed " * * * the actual loss by an avowal—a total cost of $221,815.88 less $124,283.69 in recompense." The avowal itemized all expense, breaking it down into every category. Had this evidence been admitted it would have sustained the verdict. S & H then proved, it says, what the benefit to it would have been absent the fraud. It notes that "Kentucky is ranged among the jurisdictions which give the defrauded party the benefit-of-the bargain, as distinguished from out of pocket loss." 13 A.L.R. 3d 875. It relies on Dempsey v. Marshall, Ky., 344 S.W.2d 606 (1961), in which we held:

"The * * * application of a proper rule of damages from fraudulent representations which induced a contract has long been a troublesome one and the courts of the country [have been] divided in opinion. The majority, however, seems to have accepted what is known as the 'benefit of bargain' rule instead of one which is designated as 'out of pocket.' Our state has adopted the majority rule * * * (T)he real distinction between the two lines of cases is * * * one * * * gives to the purchaser only what he has actually parted with in the bargain * * * but in addition, gives him the benefits of his bargain, by

permitting him to show what the property would have been worth had it been as represented."

The instructions told the jury that if it found for the plaintiff it was " * * * entitled to the benefits of its bargain" and the award should be " * * * the difference between the * * * bid * * * and the amount * * * plaintiff would have bid * * * " if correct information had been furnished to it. Sanford objected to this instruction "as it simply allows the jury to speculate as to what loss, if any, has been sustained by the plaintiff."

▮▮▮ Having been denied the opportunity to disclose the actual expenditures, S & H says it " * * * showed the amount * * * (it) * * * would have bid * * * if full and correct information had appeared on the plans and specifications * * * ". Hanser said a "conservative bid would have been about $231,000." Objection was made, and overruled, to the question eliciting that answer. We do not pass on the correctness of this ruling or the measure of damages in this type of case. Whichever of the two rules is applied the evidence was sufficient. On cross-examination Hanser answered that in one area calculating from the plans 17,200 cubic yards would be removed but that S & H excavated out of the whole site some 70,000 cubic yards and that almost all of it came from that one area. There was evidence of a deficiency of 74,000 cubic yards of dirt and that the estimated cost of blasting was $5,000.00 while the actual cost was $29,000.00 because of the excess rock. Hanser detailed the rock elevations as shown by the plans Wakser furnished and the rock actually cut. The cost of pushing dirt was $0.48 per cubic yard but rock moving costs were $2.40 per cubic yard. Appellee says that the damage for moving 45,000 excess cubic yards of rock was $84,400.00, enough to support the entire verdict. It cites Hi Hat Elkhorn Coal Co. v. Inland Steel Co., 370 F.2d 117 (CA 6th, 1966) and Grand Trunk Western R. Co. v.

H. W. Nelson Co., 116 F.2d 823 (CA 6th, 1941). Hi Hat stated:

"It is well settled that damages will not necessarily be disallowed merely because they may be uncertain in amount. It is sufficient if the evidence shows the result of the damage as a matter of just and reasonable inference, although the result may be only approximate."

Recovery was permitted in Pat J. Murphy, Inc. v. Drummond Dolomite, Inc., 232 F. Supp. 509 (E.D.Wis.1964), affirmed 346 F.2d 382 (CA 7th 1966), a suit over an excavation contract in which the evidence of damage was estimates of workers corroborated by observers. Sufficient facts were " * * * shown which afford a basis for measuring or computing damages with reasonable certainty." Ky. West Virginia Gas Co. v. Frazier, Ky., 195 S.W.2d 271 (1946). We deem it appropriate, however, to note that:

"The measure of damages for fraud is, as a general rule, the actual pecuniary loss sustained. Thus, as a general rule, one injured by the commission of fraud is entitled to recover such damages in a tort action as will compensate him for the loss or injury actually sustained and place him in the same position that he would have occupied had he not been defrauded." 37 Am.Jur.2d 458, Fraud and Deceit, section 342; Cf. Campbell v. Hillman, 15 B.Mon. (Ky.) 508 (1854).

The jury having concluded that a fraud was perpetrated, we hold that S & H proved damages, at least to the extent of the verdict.

The judgment is affirmed.

All concur, except OSBORNE, J., who dissents.

OSBORNE, Judge (dissenting).

The majority opinion permits an excavation contractor to recover $75,000 damage because of fraud on a contract bid of $104,000. This strikes me at first blush as

being too much fraud on too little contract. The contractor was warned by a caveat in the plans and specifications to make his own investigation of the work to be performed and not to rely upon any representations. The contractor made an investigation which is now admitted to have been inadequate. This was his own fault. After he discovered that a mistake had been made in his estimates he could have discontinued work and thus afforded the owner the opportunity of bringing in another contractor. This he did not do. In my opinion not only is the case weak upon its facts but proof of fraud is totally unconvincing. We have consistently held that the burden is on the party asserting fraud to establish it by clear and convincing proof. Rice v. Hord, 252 Ky. 469, 67 S.W.2d 715; O'Brien v. Marvin, Ky., 387 S.W.2d 282. In my opinion the proof of fraud here falls short of being either clear or convincing. It is true that it has been held that the intentional suppression of facts would give rise to an action in deceit and would destroy the "chancing contract" rule. However, in these cases the facts suppressed were facts to which the defrauded party had a right to access. Here, there was no obligation upon the part of Sanford Construction Company to furnish the material in question to S & H Contractors, Inc. Therefore, I fail to see how one can be guilty of fraud and deceit in concealing information for which there is no legal obligation to reveal. It is my opinion that the proof totally fails to show how the failure to furnish the material in the geological engineers survey deceived or influenced S & H in any manner in making up its bid in view of the fact that S & H made its own investigation of the site. It was thoroughly experienced in this type of work and was warned not to rely upon any information furnished. If every contractor who underbids a job can recoup his losses by suing the owner or prime contractor and proving that he had information at the time the bid was let, which was not made available to the contractor, then all the laws relative to contracting are in jeopardy. When the obvious weakness of the appellant's case is considered along with the improper argument made by its counsel before the jury and the disproportionate size of the verdict as compared to the total contract price, I cannot help but feel an injustice has been done.

For the foregoing reasons, I dissent.